Filed 9/30/13  P. v. Uribe CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXIS URIBE,<br><br>    Defendant and Appellant. | B242739<br><br>(Los Angeles County<br>Super. Ct. No. VA121201) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Alexis Uribe appeals his convictions for attempted murder. Uribe was sentenced to 32 years to life in prison. He contends the trial court committed instructional error. We disagree, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

In 2011, Jose Lopez (Jose) lived near Violeta Avenue in Hawaiian Gardens. Jose had two brothers, Oscar Lopez (Oscar) and Eduardo Lopez (Eduardo).[1] The Lopez home was located in a neighborhood claimed as the territory of the Varrio Hawaiian Gardens criminal street gang, but the Lopez brothers were not gang members.

Jesus Castillo, Roberto Estrada, and appellant Uribe were members of the Varrio Hawaiian Gardens gang. Castillo's brother-in-law[2] lived across the street from the Lopez home. Castillo lived in a house behind the Lopez home. For several months, Castillo, Estrada, and other persons had been jumping over the Lopezes' fence and crossing through their yard en route to visit the brother-in-law's home.

On July 1, 2011, Castillo, Estrada and Uribe were visiting at the brother-in-law's home. Jose and Oscar went across the street to speak to the brother-in-law about the fence-jumping issue. The brother-in-law peacefully discussed the problem and promised to talk to the culprits. However, during their conversation Jose could hear Uribe and Estrada stating that Jose and Oscar were "paisas" and were gay.[3] Uribe and Estrada loudly said "they were going to do whatever they wanted to do." They lifted their shirts, made hand signs, and laughed in a mocking fashion. Oscar and Jose did not respond to Uribe's and Estrada's behavior.

Oscar and Jose returned to the Lopez residence and, along with some other relatives, began drinking beer in their garage. Approximately an hour and a half later,

---

[1]     For ease of reference, and with no disrespect, we hereinafter sometimes refer to the Lopez brothers by their first names.

[2]     Castillo's brother-in-law's name is not contained in the record.

[3]     "Paisas" is a derogatory term for Hispanic persons who do not speak English well.

they decided to go to a liquor store to obtain more beer. As they were leaving they encountered Uribe, Estrada, and Castillo. The trio confronted the Lopez brothers, stating that they were members of the Varrio Hawaiian Gardens gang and "were going to do whatever they wanted." They again called the Lopez brothers "paisas." Oscar turned and looked at the men, but neither he nor Jose said anything to them.

Oscar and Jose returned from the liquor store about 10 minutes later. Estrada, Castillo, and Uribe were standing in the street. Estrada yelled that the Lopez brothers were gay and called them names, including "bitches" and "motherfucker." Estrada said, " 'I'm in Hawaiian Gardens and I'm going to do whatever I want,' " and " 'I'm in my varrio.' " He yelled that he was "not going to stop jumping that fence." Estrada threw gang signs, clenched his fists, and loudly and aggressively said, " 'you want to get down' " and " 'Let's go,' " challenges to fight. He assumed a fighting stance, raising his fists in the air.

Oscar became angry, approached Estrada, and punched Estrada in the face. Estrada appeared stunned, but did not fall to the ground. Oscar then moved toward Castillo. Uribe pulled at the waistline of his pants and raised his fist as if he was about to hit Oscar. Jose punched Uribe in the face to protect Oscar. Castillo then fired approximately six gunshots in rapid succession. Two of the shots hit Jose in the back and arm. Oscar was uninjured, but had a hole in his shirt. Neither Jose nor Oscar was armed. The gang members left the scene.

Eduardo had observed the incident from the Lopez family's garage. He identified Castillo as the shooter.

Jose spent a month in the hospital. At the time of trial, a bullet remained lodged in his back. He suffered from back pain and his left leg remained numb.

A gang expert testified that territory is very important to Varrio Hawaiian Gardens gang members, who will commit assaults and other violent crimes to protect it. Respect was also of paramount importance to the gang. A gang member who is not respected is considered a coward, and will not be tolerated by the gang. A person who shows disrespect to a Varrio Hawaiian Gardens gang member will be assaulted by the gang. If a

3

person punches a gang member, other gang members will assault him. The victim is likely to "either end up in the hospital with some broken bones or end up dead." In gang culture, it is crucial that gang members back each other up. If a fellow gang member is "getting jumped," other gang members are obligated to "jump in and help them." Varrio Hawaiian Gardens gang members commonly possesses firearms.

When given a hypothetical based upon the facts of the case, the expert opined that the crimes were committed for the benefit of the Varrio Hawaiian Gardens gang.[4] A request that gang members stop jumping a fence and cutting through a yard would be viewed as disrespectful, because in the gang's view, the entire neighborhood belongs to them. Confronting the victims and shooting at them would indicate that "the Hawaiian Gardens gang can do whatever they want, when they want."

2. *Procedure.*

Trial was by jury. Uribe was convicted of the attempted murders of Oscar and Jose Lopez (Pen. Code, §§ 664, 187, subd. (a)).[5] As to both counts, the jury found a principal personally and intentionally used and discharged a firearm, proximately causing great bodily injury (§ 12022.53), and that the crimes were committed at the direction of, for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). The jury found allegations the attempted murders were willful, deliberate, and premeditated not true. The trial court sentenced Uribe to a term of 32 years to life in prison.[6] It imposed a restitution fine, a suspended parole restitution fine, a court operations assessment, and a criminal conviction assessment. Uribe appeals.

---

[4] The People presented additional evidence relevant to prove the Penal Code section 186.22, subdivision (b) gang enhancement. Because Uribe does not challenge the sufficiency of the evidence to prove the enhancement, we do not further detail it here.

[5] All further undesignated statutory references are to the Penal Code.

[6] Upon the prosecutor's motion, a section 667.5, subdivision (b) prior prison term allegation was dismissed.

DISCUSSION

*The trial court did not err by failing to sua sponte instruct the jury on voluntary manslaughter.*

Uribe was tried as an aider and abettor on a natural and probable consequences theory. The prosecution theorized that he directly aided and abetted the target crime of challenging another to a fight in public, and was therefore responsible for the natural and probable consequences of that crime, attempted murder. The defense did not request, and the trial court did not give, instructions on voluntary manslaughter. Uribe contends this was prejudicial error.

a. *Applicable legal principles.*

A trial court must instruct the jury, sua sponte, on the general principles of law relevant to the issues raised by the evidence. (*People v. Enraca* (2012) 53 Cal.4th 735, 758; *People v. Booker* (2011) 51 Cal.4th 141, 181; *People v. Moye* (2009) 47 Cal.4th 537, 548.) Instructions on a lesser included offense are required when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense, but not the charged offense. (*Booker*, at p. 181; *People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) " ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." [Citations.]' " (*Enraca*, at p. 758; *People v. Thomas* (2012) 53 Cal.4th 771, 813; *Manriquez*, at p. 584.) We independently review the trial court's failure to instruct on a lesser included offense. (*Booker*, at p. 181; *Manriquez*, at p. 587.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a); *People v. Manriquez, supra*, 37 Cal.4th at p. 583.) Voluntary manslaughter is the intentional but nonmalicious killing of a human being. (*Manriquez*, at p. 583; *People v. Moye, supra*, 47 Cal.4th at p. 549; § 192, subd. (a).) Voluntary manslaughter, and attempted voluntary manslaughter, are lesser included offenses of murder and attempted murder, respectively. (*Manriquez*, at p. 583; *People v. Lee* (1999) 20 Cal.4th 47, 59;

5

*People v. Avila* (2009) 46 Cal.4th 680, 705; CALCRIM Nos. 603, 604.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*Manriquez*, at p. 583; *Lee*, at pp. 58-59.)

An aider and abettor's "liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117; *People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Favor* (2012) 54 Cal.4th 868, 874; *People v. Prettyman* (1996) 14 Cal.4th 248, 254; *People v. Lisea* (2013) 213 Cal.App.4th 408, 414-415.) A natural consequence is one within the normal range of outcomes that may be reasonably expected to occur if nothing unusual intervenes. (*People v. Leon* (2008) 161 Cal.App.4th 149, 158.) "Probable" means likely to happen. (*Ibid*.)

"To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 254.) " 'The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citations.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably

6

foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina*, *supra*, 46 Cal.4th at p. 920; *People v. Favor*, *supra*, 54 Cal.4th at p. 874; *People v. Lisea, supra,* 213 Cal.App.4th at p. 415.) Whether a consequence was reasonably foreseeable is a factual issue to be resolved by the jury, and turns on the circumstances surrounding the conduct of both the perpetrator and the aider and abettor. (*Favor,* at p. 874; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1587.)

A defendant who aids and abets a target crime may be either more or less culpable than the direct perpetrator, depending on whether he has a more or less culpable state of mind. (*People v. McCoy, supra,* 25 Cal.4th at p. 1122; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 851; *People v. Nero* (2010) 181 Cal.App.4th 504, 513-514.) In *People v. Woods, supra,* 8 Cal.App.4th 1570, a divided court held that the same may be true in the somewhat different context of aider and abettor liability premised on the natural and probable consequences doctrine, and the jury must be instructed accordingly. (*Id.* at p. 1577.) *Woods* reasoned: "Even when lesser offense instructions are not required for the perpetrator . . . , the trial court may have a duty to instruct sua sponte on necessarily included offenses as to aider and abettor liability. If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the [target offense] but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability. Otherwise . . . the jury would be given an unwarranted, all-or-nothing choice concerning aider and abettor liability. [¶] However, the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise. [Citations.]" (*Id.* at p. 1593.)

7

b. *Application here.*

Here, the trial court gave the jury standard instructions on aiding and abetting (CALJIC Nos. 3.00 [principals defined]; 3.01 [aiding and abetting - defined];[7] 3.02 [natural and probable consequences doctrine][8]), as well as a special instruction defining the target offense.[9] The court also gave CALJIC Nos. 5.32 (use of force in defense of

---

[7] CALJIC No. 3.01, as given to the jury, stated: "A person aids and abets the commission or attempted commission of a crime when he: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, or, by failing to act in a situation where a person has a legal duty to act, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and . . . the failure to prevent it does not amount to aiding and abetting."

[8] CALJIC No. 3.02, as given to the jury, provided in pertinent part: "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] In order to find the defendant guilty of the crime of attempted murder, under this theory, as charged in Counts One and Two, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of challenge to a fight was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crimes of attempted murder; and [¶] 4. The crimes of attempted murder was [*sic*] a natural and probable consequence of the commission of the crimes of challenge to a fight. [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen."

[9] The special instruction provided: "The crime of challenging another to a fight is referred to as the target offense in this case. [¶] The prosecution must prove beyond a reasonable doubt the following: [¶] 1. A principal willfully and unlawfully challenged another person in a public place to fight, or [¶] 2. used offensive words in a public place which are inherently likely to provoke an immediate violent reaction."

8

another)[10] and 5.55 (plea of self-defense may not be contrived).[11]

Uribe does not challenge the sufficiency of the evidence to prove attempted murder was a natural and probable consequence of the target crime of challenging another to fight. (See, e.g., *People v. Medina, supra,* 46 Cal.4th at pp. 919-920.) However, he argues that a jury would have been more likely to conclude voluntary manslaughter was a foreseeable consequence of the target crime than was an intentional murder. Therefore, he urges, the trial court had a sua sponte duty to instruct on voluntary manslaughter on both heat of passion/sudden quarrel and imperfect self-defense theories. In his view, omission of the instructions was reversible error.

Assuming the *Woods* majority opinion correctly states the law,[12] we discern no error. Whatever the merits of Uribe's argument in the abstract, it fails here because no

---

[10] CALJIC No. 5.32, as given to the jury, provided: "It is lawful for a person who, as a reasonable person, has grounds for believing and does believe that bodily injury is about to be inflicted upon another person . . . to protect that individual from attack. [¶] In doing so, he may use all force and means which that person believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

[11] CALJIC No. 5.55, as given to the jury, stated: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

[12] In a somewhat different context, *People v. Canizalez, supra,* 197 Cal.App.4th 832, held that when the natural and probable consequences doctrine is at issue, an aider and abettor's liability is the same as the direct perpetrator's. In *Canizalez,* the court considered whether a jury instruction stating that an aider and abettor is "equally guilty" as a principal was not error when applied in the context of the natural and probable consequences doctrine. (*Id.* at p. 852.) *Canizalez* explained: "Aider and abettor culpability under the natural and probable consequences doctrine . . . has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. . . . Because the nontarget offense is

9

evidence suggested Castillo acted in the heat of passion upon legally adequate provocation, or with the actual belief he or his cohorts were in imminent danger sufficient to warrant deadly force. There was likewise no evidence that either theory could have otherwise applied to Uribe. The evidence showed that if Uribe was guilty at all, he was guilty of more than voluntary manslaughter. (See *People v. Woods, supra,* 8 Cal.App.4th at p. 1578.)

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Enraca, supra,* 53 Cal.4th at p. 759; *People v. Moye, supra,* 47 Cal.4th at p. 550.) " ' "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116; *People v. Lee, supra,* 20 Cal.4th at p. 59.) "The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*Lee*, at p. 59; *People v. Manriquez, supra*, 37 Cal.4th at p. 583.) The victim's conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Enraca,* at p. 759; *Lee*, at p. 59.) Thus, the heat of passion requirement has both an objective and a subjective component: " 'The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise

_____

unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be 'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime." (*Id.* at p. 852.) Because we conclude the trial court did not err under the *Woods* analysis, we need not consider whether *Canizalez* and *Woods* may be harmonized.

to the heat of passion are also viewed objectively.' " (*Manriquez*, at p. 584; *Enraca*, at p. 759.) Adequate provocation and heat of passion must be affirmatively demonstrated. (*Lee*, at p. 60; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312.)

There was no evidence of legally adequate provocation in the instant case. The undisputed evidence showed that Uribe and his compatriots, angered by Oscar's complaint about their trespassing, verbally taunted and implicitly threatened Oscar and Jose. When Oscar peacefully spoke to Castillo's brother-in-law, Uribe and Estrada called Oscar and Jose insulting names, laughed at them, made gang signs, and raised their shirts. Oscar and Jose did not respond to the insults. Later, when Oscar and Jose encountered Uribe's group before heading to the store, Uribe's group stated their gang affiliation, called the Lopez brothers insulting names, and reiterated that they would do "whatever they wanted." The Lopez brothers did not respond. Finally, when Oscar and Jose returned from the liquor store, they encountered all three men in the street. Uribe's group again called the Lopez brothers names, including "bitches" and "motherfuckers," and Estrada belligerently challenged them to a fight. At that point Oscar accepted Estrada's challenge and punched him. Jose then punched Uribe, who had pulled at the waistline of his pants and raised his fist as if to punch Oscar.

None of this evidence showed either of the Lopez brothers engaged in any legally provocative conduct that might have supported a heat of passion finding. Oscar's polite complaint to Castillo's brother-in-law about the fence-jumping issue was obviously not provocative: the trespassers, not the Lopezes, were in the wrong. While Uribe's group may have considered the complaint an affront to their gang's control of the neighborhood, the provocation standard "is not the reaction of a 'reasonable gang member.' " (*People v. Enraca*, *supra*, 53 Cal.4th at p. 759.)

That Oscar responded to Estrada's challenge to fight and threw the first punch likewise did not provide evidence of provocation. *People v. Johnston, supra,* 113 Cal.App.4th 1299, is instructive. There, the defendant, angry with his ex-girlfriend and her family, armed himself with a knife, travelled to the girlfriend's residence at 5:00 a.m., demanded that she exit the house, verbally abused her mother and family members, and

11

threatened violence to the family. He then stood on the front porch, shouting and challenging the ex-girlfriend's brothers to come out and fight. One of the brothers accepted the challenge and a mutual fight ensued. When the brother, who was unarmed, got the better of the defendant in the fight, the defendant pulled a knife and stabbed him to death. (*Id.* at pp. 1302-1304.) The jury convicted the defendant of second degree murder but the trial court reduced the offense to voluntary manslaughter reasoning that the victim, not the defendant, started the fight. (*Id.* at p. 1310.) The appellate court reversed. The court framed the issue as follows: "Can a person who provokes a fight be heard to assert provocation by the victim, such that a reasonable person in his position would lose judgment and kill?" (*Id.* at p. 1312.) *Johnston* concluded the answer was no. The court explained: "it was [the defendant] who instigated the fight with [the victim] by creating a loud disturbance at the residence, cursing the mother of the victim and girlfriend and, most particularly, challenging [the victim] to come out and fight. Having done that, he cannot be heard to assert that *he* was provoked when [the victim] took him up on the challenge. Defendant was 'culpably responsible' for the altercation." (*Id.* at p. 1313; see also *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [" ' "A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter" ' "].)

The same is true here. Uribe's group taunted Oscar and Jose repeatedly, accosted them in the street, and then challenged them to a fight. Having done these things, Uribe cannot now complain that the Lopez brothers provoked him or his compatriots. Uribe attempts to distinguish *Johnston* by pointing out that there, the defendant not only challenged the victim to fight, but also threatened the victim and his family with violence and death, a fact the *Johnston* court at one point incorporated into its holding. (*People v. Johnston, supra,* 113 Cal.App.4th at p. 1303 ["We conclude that a defendant who provokes a physical encounter by rude challenges to another person to fight, coupled with threats of violence and death to that person and his entire family, is not entitled to claim

that he was provoked into using deadly force when the challenged person responds without apparent (or actual) use of such force"].)  However, we view this as a distinction without a difference.  *Johnston*'s point was that a person who challenges another to a fight cannot then assert he was provoked when the challenge is accepted.

Contrary to Uribe's argument, this case is nothing like *People v. Breverman, supra,* 19 Cal.4th 142.)  In *Breverman,* a "sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed" on the defendant's property, acted in a menacing manner, challenged the defendant to fight, slashed one of the defendant's tires, and battered and smashed his car.  (*Id*. at p. 163.)  In response, the defendant fired shots at the armed group, hitting and killing one of them.  The defendant and other people inside the house testified that "the number and behavior" of the "mob" of intruders caused the defendant immediate fear and panic.  (*Id.* at p. 163.)  Under these circumstances, "a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition."  (*Ibid.*)  It is obvious that the Lopez brothers' conduct bore no resemblance to that of the victim in *Breverman.*

Moreover, and equally important, there was no evidence Castillo *actually* acted under the influence of passion resulting from provocation.  There was no direct evidence on the point.  No circumstantial evidence suggested Castillo was enraged and acted rashly.  Castillo was not embroiled in the fistfight, and did not say or do anything indicating his passions were inflamed.  Nothing in the evidence suggested a heat of passion defense was somehow available to Uribe, when it would not have been available to Castillo.

Nor was there evidence that would have supported an imperfect self-defense theory.  Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer, or a third person, was in imminent danger of death or great bodily injury.  (*People v. Booker, supra,* 51 Cal.4th at p. 182; *People v. Cruz* (2008) 44 Cal.4th 636, 664; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.)

Assuming Uribe's group was entitled to defend themselves once Oscar and Jose accepted the challenge to fight and punched Estrada and Uribe,[13] there was nonetheless insufficient evidence to allow the jury to find imperfect self-defense for at least two reasons. First, there was no evidence whatsoever regarding Castillo's state of mind at the time. There was no direct evidence suggesting Castillo shot due to an actual fear of imminent harm. There was likewise no circumstantial evidence from which the jury might have inferred Castillo shot because he unreasonably believed he or his cohorts were in imminent danger. Up until the moment Oscar punched Estrada, the gang members pursued the Lopez brothers, repeatedly attempting to provoke a confrontation. Uribe's group did not act as if they were afraid of the Lopez brothers. To the contrary, their mocking and insulting behavior suggested an absence of fear. At the time Castillo shot, the fistfight had barely begun. Oscar and Jose had thrown one punch each. Oscar's punch stunned Estrada, but did not knock him to the ground. Uribe's group did not attempt to retreat in response, and did not say or do anything indicating fear of imminent harm. The Lopez brothers were unarmed. No evidence suggested Uribe's group could have believed otherwise. The Lopezes were also outnumbered, three to two. Thus, there

---

[13] The doctrine of imperfect self-defense cannot be invoked by a defendant whose own wrongful conduct, such as a physical assault or commission of a felony, created the circumstances in which the adversary's attack was legally justified. (*People v. Booker, supra,* 51 Cal.4th at p. 182; *People v. Valencia* (2008) 43 Cal.4th 268, 288-289; *People v. Vasquez, supra,* 136 Cal.App.4th at p. 1179 ["Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant"].) However, "the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Vasquez*, at pp. 1179-1180.) "[N]o provocative act which does not amount to a threat or attempt to inflict injury, and no conduct or words, no matter how offensive or exasperating, are sufficient to justify a battery [citations]." (*People v. Mayes* (1968) 262 Cal.App.2d 195, 197; *People v. Davis* (1995) 10 Cal.4th 463, 542-543; CALCRIM No. 917.) Here, the taunts and Estrada's challenge to fight did not justify Oscar's and Jose's punches, unless the jury concluded the gang members' conduct amounted to a threat to inflict injury. (See *People v. Johnston, supra,* 113 Cal.App.4th at p. 1313 ["Defendant's words did not justify [the victim's] attack"].)

were no facts from which Uribe's group could have concluded the Lopez brothers were about to apply lethal force. In short, no evidence suggested Castillo—or Uribe or Estrada—actually feared imminent bodily harm. In light of this evidentiary deficiency, imperfect self-defense instructions were unwarranted.

Second, Castillo's use of deadly force in response to a mere fistfight defeats any claim of self-defense, perfect or imperfect. As *People v. Lee* explained, a defendant who kills during a sudden quarrel or "mutual combat" "may not take undue advantage" by using deadly force against an unarmed victim. (*People v. Lee, supra,* 20 Cal.4th at p. 60, fn. 6.) "[I]n case of mutual combat, in order to reduce the offen[s]e from murder to manslaughter, it must appear that the contest was waged upon equal terms, and no undue advantage was sought or taken by either side; for, if such was the case, malice may be inferred, and the killing amount to murder." (*People v. Sanchez* (1864) 24 Cal. 17, 27 [cited by *Lee*].) In *Lee*, for example, the defendant and his wife were engaged in an argument that entailed mutual pushing and shoving. The defendant's use of a gun under these circumstances "was necessarily an undue advantage." (*Lee*, at p. 60, fn. 6; see also *People v. Valencia, supra,* 43 Cal.4th at p. 288, fn. 6 [if a defendant unreasonably believed the victim "was going to punch him in the arm and stabbed him to death in response, this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force"]; *People v. Johnston, supra,* 113 Cal.App.4th at p. 1313.) Here, Castillo took undue advantage by suddenly using a gun in a fistfight against unarmed victims. Under these circumstances, the jury could not have concluded Castillo was guilty only of voluntary manslaughter on either a perfect or an imperfect self-defense theory. No evidence suggests it could have come to a different conclusion as to Uribe.

Uribe contends that, having given instructions on "perfect" self-defense, the court was required to instruct on imperfect self-defense. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824 ["If there was substantial evidence of [the defendant's] 'honest belief' for self-defense purposes, there was substantial evidence of his 'honest belief' for *imperfect* self-defense purposes"]; see also *People v. Viramontes* (2001) 93 Cal.App.4th

15

1256, 1262 ["if the evidence is sufficient to support instruction on self-defense, it is also sufficient to support instruction on imperfect self-defense"]; but see *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231 [" 'just because a trial court instructs a jury on perfect self-defense, this does not necessarily mean it has a sua sponte duty to also instruct on *imperfect* self-defense' "].)  Here, self-defense instructions were warranted insofar as they advised the jury that Uribe's group may have been entitled to defend against Oscar's and Jose's punches, but could not use force beyond that which would appear reasonably necessary to prevent imminent injury.  (CALJIC No. 5.32.)  But as we have explained, there was no evidence from which jurors could have concluded Castillo acted with the belief, reasonable or unreasonable, that he or his companions were in imminent danger, and therefore there was insufficient evidence *the shooting* was committed in self-defense, perfect or imperfect.  Therefore, the court did not have a sua sponte duty to instruct on imperfect self-defense.  (See *People v. De Leon, supra,* 10 Cal.App.4th at pp. 824-825 [although court gave self-defense instruction, it properly omitted imperfect self-defense instruction where there was no substantial evidence of an honest belief in imminent peril to support either self-defense or imperfect self-defense].)

In sum, contrary to Uribe's argument, there was insufficient evidence the direct perpetrator, Castillo, acted in the heat of passion or upon a sudden quarrel, or in imperfect self-defense.  There was likewise no evidence suggesting that a heat of passion or imperfect self-defense theory could have applied to Uribe.  Uribe does not point to evidence or extenuating circumstances that might have allowed the jury to find such theories applied to him, or might have led to a finding his individual culpability was less than the shooter's.  (See generally *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 44.)  Accordingly, the trial court had no duty to instruct on voluntary manslaughter.  (*People v. Woods, supra,* 8 Cal.App.4th at p. 1593.)  There was no error.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.