Filed 12/18/13  P. v. Allen CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B236473 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA047368) |
| v. | |
| COREY D. ALLEN et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge.  Modified with direction, and, as modified, affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Corey D. Allen.

Fay Arfa and Fay Arfa for Defendant and Appellant Torin Allen Comeaux.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A sport utility vehicle (SUV) pulled alongside two men walking. Someone from the SUV fired shots at the men, injuring one. Defendants and appellants Corey D. Allen and Torin Allen Comeaux were found guilty of crimes relating to this incident, namely, two counts of assault with a firearm and one count of shooting from a motor vehicle. The jury also found true gang and principal gun use allegations. Defendants' primary contentions on appeal concern the sufficiency of the evidence to support the judgment, the denial of their motion to sever trial, the gang allegations, and instructional error.[1] We reject all contentions, although a five-year term imposed under the gang statute must be stricken. We therefore modify the judgment and affirm it as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Factual background.

A.     *March 2008: Defendant Allen becomes a police confidential informant.*

In March 2008, while conducting a parole search of Allen's home, Sergeant Joseph Fender from the Los Angeles County Sheriff's Department found a gun under Allen's bed. To avoid jail, Allen agreed to become a police confidential informant. According to pre-arranged scenarios, Allen would inform Fender whether someone had a gun at a party or at a house. Fender gave his personal cell phone number to Allen, and, on a day one of these scenarios was occurring, they would talk 15 to 20 times.

In the first month Allen was a confidential informant, he worked off his arrest. He then became a paid informant, making about $150 per arrest or recovered gun. Using information Allen provided, Fender made eight to ten arrests and recovered about a dozen guns.

The last arrest Fender made using information Allen provided was in June 2008. On July 1, 2008, Fender was promoted and transferred from Palmdale to Lancaster, leading to a tapering off of his relationship with Allen. By the time of the crimes at issue, Allen was no longer working as a confidential informant for Sergeant Fender, who could

---

[1]     Each defendant joins the other's contentions to the extent applicable.

not recall speaking to Allen on or around August 10, 2008.[2]  Allen never told the sergeant he was going to a party that evening.

B.    *August 10, 2008*: *The assaults with a firearm of Durrell Dilworth and Delino Dixon*.

On the evening of August 10, 2008, Robert Daniels was having a party at his house in Lancaster.  His friends, Ray and Keith, acted as informal security at the door.  Because Daniels's foster daughter wanted to invite more people, Daniels drove her around the corner to ask friends to join the party.

While waiting, Daniels noticed a tan Suburban with three rows of seats.  Daniels estimated there were six to eight people in the car.  Allen drove, Bionka Keith (Allen's girlfriend) was in the front passenger seat, and Comeaux sat in the second row behind Allen.  Gregory Jefferson[3] and Treyvon Daniels were also in the Suburban.[4]  Allen followed Daniels to his house.  When people from Allen's Suburban tried to come into the house, Ray and Keith patted them down.  Comeaux refused to be patted down, and he returned to the Suburban, escorted by Daniels and Ray.  Daniels tried to calm an upset Comeaux.  When Ray, a Blood gang member, said "BOP," Bloods on Point, Comeaux replied that he would "murk this nigger" and "this is BOP killer."  Daniels also heard a man from the second or third row in the car say, " 'Paybacc Gangster Crip[s].' "

Comeaux got out of the car and lifted his shirt, revealing a handgun in his waistband.  Daniels got Ray to go back to the house, and Comeaux got back into the car.  Allen, who was still in the driver's seat, and Daniels talked briefly about taking things

---

[2]    Phone records showed that Allen called Fender multiple times around the time of the crime at issue, including on August 11, 2008.

[3]    Jefferson was a Shotgun Crip.  He testified that he sat in the third row, Allen was the driver, and Treyvon Daniels and Comeaux sat in the middle row.  Treyvon Daniels testified in the defense case that he was in the Suburban, but he got out to go to the party and did not return to the vehicle.

[4]    Daniels identified Comeaux from a photographic six-pack.  He was "a hundred percent" sure Comeaux was sitting behind Allen, who he identified as the driver from another photographic six-pack.

3

easy and not having any trouble. The Suburban then drove away. When Allen's vehicle was about a half block away, Daniels heard gunshots.

Around this same time, Durrell Dilworth and Delino Dixon were walking to Daniels's party. A tan or champagne Tahoe with six people in it pulled up next to them so that the driver's side was next to Dilworth. The driver's side and rear windows were down. Allen was in the driver's seat.[5] Dixon knew Allen as "Pac-man," who associated with Young Gangster Crips and with whom he had a "beef."[6]

Allen asked, " 'Where are you all from?' " He also asked Dilworth why he had on "red Chucks" or "dead-ass Chucks."[7] Although Dilworth replied he didn't bang or was from nowhere and he wore the shoes to " 'match my fade,' "[8] Dixon said he was from Liggett Street Gangsters. Someone from the back seat area asked, " 'Aren't you all Bloods?' " but Dixon replied, "We're not. We're gangsters." Dixon heard Allen say, " 'All right,' " and begin to pull the car away. Someone in the car said, " 'Them Bloods, them Bloods.' " Dixon said they weren't Bloods, but gunshots were fired from the car. Dilworth was shot twice, but he survived.

At trial, Dixon and Dilworth testified they could not tell who was the shooter, although Dixon saw a muzzle flash come from a gun held by a rear passenger. This testimony contradicted statements they made to the deputy sheriff who responded to the scene that the driver, Allen, was the shooter. Neither Dixon nor Dilworth ever identified Comeaux as a passenger in the vehicle.

Keith, who was in the front passenger seat, testified that when they got to Daniels's party, Jefferson, Treyvon Daniels, and Comeaux got out of the car while she

---

**5**     Dilworth and Dixon identified Allen as the driver at trial. Dixon had previously identified Allen as the driver from a photographic line-up. Neither Dilworth nor Dixon got a clear look at the passenger sitting behind Allen.

**6**     At trial, Dixon dismissed the notion he had a problem with Allen as rumor.

**7**     Converse sneakers.

**8**     Dilworth was, however, a former member of TNL—Teaching Niggers Lessons.

4

and Allen stayed. When the three men returned, Comeaux sat behind Allen, the driver.[9] They drove away, but Comeaux told Allen to stop the car by two young men who were walking. Allen said something to the men about being Bloods. Comeaux said something about red "Chucks" and "BOP Killer." One or both of the men on the street said they were from Liggett Street Gangsters. Although Keith did not see who fired the shots, she saw Comeaux lean out of the window with a gun.[10] Detective Simon, however, testified that Keith told him that Comeaux was the shooter. When Keith was later leaving the car, Comeaux told her to keep her mouth shut or something bad would happen to Allen and their baby.

Jefferson testified that he was in the car that night, sitting in the third row, behind Comeaux and Treyvon Daniels.[11] Detective Simon testified that Jefferson told him Comeaux was the shooter, although Jefferson denied making such a statement.

    C.    *Gang evidence.*

    **1.    The Gardena Paybacc Crips and the Young Gangster Crips.**

When Sergeant Fender arrested Allen in March 2008, Allen told him that he'd been a Gardena Paybacc Crip for five years, and he had " 'Gardena,' " " 'young and active,' " and " 'Pac-man' " tattooed on his body. He also told the sergeant the gang committed "shootings, robberies and so forth." Allen later told Detective Simon he had been jumped out of Paybacc and started the Young Gangsters Crips. Keith, Allen's girlfriend, testified that he was known as Pac-man, but she did not know his position in the Young Gangster Crips gang.

Gardena Police Officer Alex Rivera testified as the People's gang expert. As a detective in Gardena Police Department's gang unit, he received training about Paybacc Crips and Shotgun Crips, two dominant gangs in Gardena. Paybacc was one of the first

---

[9]    Keith was initially uncertain where Jefferson sat, but then she said that Comeaux, Jefferson, and Treyvon Daniels sat in the middle row.

[10]    Keith also said she never saw Allen or anyone else with a gun that night.

[11]    Because Jefferson was unavailable, his prior testimony was read to the jury.

Crip gangs in West Los Angeles. The Shotgun Crips and Paybacc are allies, and Young Gangster Crips is a clique or subset of Paybacc.[12] Their colors are green and blue and they use the Green Bay Packers logo. Rival gangs include Denver Lanes, Hoover Crips, and 135 Piru. As of August 2008, Paybacc had probably 300 members.

Rivera has spoken to Paybacc members "[a] lot," and he personally investigated crimes they committed, for example, "[d]rug sales, weapons sales, robberies, burglaries." He participated in murder and carjacking investigations, although he was not the investigating officer. Gang members from Paybacc, Young Gangster Crips, and the Shotgun Crips commit drug and weapon sales, drug possession, robberies, burglaries, murder, carjacking, graffiti, and "[p]robably a lot more." Paybacc, as well as Shotgun Crips and Young Gangster Crips, engage in a pattern of criminal activity. The detective said: "I mean, like I said, the two years—two and a half years that I have been working as a gang investigator, I've worked tons—the variety of crimes that this gang is involved in. I mean, I can bring you up to a case that I have waiting for me on my desk when I get done with this case. It is anything from robberies to drug sales to weapons sales to violent crimes. You name it."

Bobby Evans, a Paybacc, was convicted of robbery in 2006. Jasmine Kane, also a Paybacc, was convicted of possessing cocaine base for sale in 2005.

Based on Allen's admissions, photographs of Allen in gang attire and making gang signs with his hands, his associates, and tattoos, it was the detective's opinion that Allen was an active Paybacc Crip. Based on a hypothetical modeled on the facts of this case, Rivera's opinion was that such a crime would be committed for the benefit of or at the direction of or in association with a criminal street gang. Such a shooting promotes, furthers or assists criminal conduct by other gang members by increasing the gang's reputation and spreading fear.

---

[12] Other than what he learned through this case, he had no knowledge whether Paybacc members go back and forth from Gardena to Antelope Valley.

## 2. The Bad Influence Gang (B.I.G.).

Detective Simon testified as the People's gang expert on B.I.G. In August 2008, the detective was assigned to the gang unit for about two years. While working in jail facilities, he had hundreds of contacts with gang members. When he was thereafter assigned to patrol, he investigated dozens of gang-related crimes and arrested hundreds of gang members. He personally contacted between 1,000 and 1,500 gang members, several hundreds of which were due to arrests.

Antelope Valley gangs have been unable to establish a clearly defined turf, although Detective Simon has seen B.I.G. graffiti concentrated on the East side of Lancaster. Antelope Valley has a "nontraditional gang atmosphere." It is more common in Antelope Valley for members of one gang to operate alongside another gang to achieve a common goal. It would therefore not surprise him to find B.I.G., Shotgun Crips, Gardena Paybacc Crips, and Young Gangster Crips in the same car. The detective, however, knew of no official alliance to Paybacc.

B.I.G. is an Antelope Valley-based gang. It started in the early 1990's as a tagging crew and it has approximately 30 to 35 active members. It is neither a Blood nor a Crip gang; rather, they are "neutral," identifying, for example, with no known colors. Detective Simon has seen tattoos and graffiti referring to " 'Bad Gang,' " " 'B.I.G.,' " and " 'Bad Caster.' " Bloods on Point and Penthouse Players are two of B.I.G.'s primary enemies.

Detective Simon's first contact with the gang was in 2003 or 2004, and, over the course of his career, he had multiple contacts with B.I.G. members and talked to other officers about the gang. B.I.G.'s primary criminal acts are "[n]arcotics possession, particularly narcotics possession for sale, robbery, felony weapons possession, attempted murder, and vandalism." Detective Simon arrested members of the gang and led investigations involving B.I.G., where members were victims and suspects. He led a robbery investigation where B.I.G. was the victim, and he was involved in illegal weapons and felony narcotics possession cases involving B.I.G. He also worked on another case involving Cedric Parker, a B.I.G. member who shot a rival gang member. In

June 2008, Parker was convicted of attempted murder. Detective Simon was also familiar with Lajon Dante Yancy, a B.I.G. member who was convicted of burglary.

Comeaux has tattoos associated with B.I.G., as well as " 'stay strapped' "[13] on his neck. His moniker is T-Fade. Keith did not know Comeaux but she had heard he was a B.I.G. who was "known as getting people" and who put in a lot of work. Based on Comeaux's tattoos, field identification cards, conversations the detective had with Keith and Allen and law enforcement officers, Detective Simon's opinion was that Comeaux was a B.I.G. member.

Based on a hypothetical modeled on the facts of this case, Detective Simon believed that such a crime would be committed for the benefit of or at the direction of or in association with a criminal street gang.

## II.    Procedural background.

An information charged Allen and Comeaux with committing these crimes against Dilworth and Dixon: counts 1 and 2, assault with a firearm (Pen. Code, § 245, subd. (a)(2));[14] counts 3 and 4, attempted murder (§§ 187, subd. (a), 664); and count 5, shooting from a motor vehicle (former § 12034, subd. (c)).[15] Gang enhancements were alleged as to counts 1 and 2 (§ 186.22, subd. (b)(1)(B) & (C)). Because it was the People's theory that Comeaux was the shooter, the information alleged, as to count 1, that Comeaux inflicted great bodily injury on Dilworth (§ 12022.5) and, as to count 2, that he personally used a firearm (§ 12022.5, subd. (a)). As to count 5, the information alleged gun use by a principal (§ 12022.53, subds. (b), (c), (d) & (e)(1)) and that sentencing should be under section 186.22, subdivision (b)(5).[16]

---

[13]    This means to carry a gun always.

[14]    All further undesignated statutory references are to the Penal Code.

[15]    Section 12034 was repealed, effective January 1, 2012, and reenacted as section 26100 without substantive change.

[16]    The information also alleged gun enhancements as to counts 3 and 4 for attempted murder.

8

After the trial court denied their motions to sever trial, defendants were jointly tried before a jury. On November 17, 2010, the jury found Allen and Comeaux guilty of counts 1 and 2, assault with a firearm (§ 245, subd. (a)(2)) and of count 5, shooting from a motor vehicle (former § 12034, subd. (c)). As to counts 1 and 2, the jury found gang allegations true under section 186.22, subdivision (b)(1)(B). As to count 5, the jury found true a gang allegation under section 186.22, subdivision (b)(1)(C) and principal gun use allegations under section 12022.53, subdivisions (b), (c), (d) and (e)(1). The jury found not true the personal gun use and great bodily injury allegations (§§ 12022.5, subd. (a), 12022.55) alleged against Comeaux as to counts 1 and 2. The trial court declared a mistrial on counts 3 and 4 for attempted murder after the jury deadlocked on those counts.

On September 30, 2011, both defendants were sentenced to 39 years in prison as follows: the high term of seven years on count 5 doubled due to prior strikes to 14 years, plus 25-years-to-life terms for the gun enhancement under section 12022.53, subdivisions (d) and (e)(1). The court imposed but stayed five-year terms for the gang enhancement (§ 186.22, subd. (b)(1)(B)). The court imposed but stayed under section 654 sentences on counts 1 and 2 and the remaining gang enhancements.

## DISCUSSION

### I.      Sufficient evidence supports the judgments.

Comeaux and Allen both contend there was insufficient evidence they aided and abetted the crimes.[17] We disagree.

---

[17]      Comeaux contends that because the jury found the personal gun use and great bodily injury allegations against him not true that his liability must be based on an aider and abettor theory. Allen similarly contends that because he was prosecuted as an aider and abettor, his guilt must be based on that theory. The jury, however, found true gun use by a principal allegations as to count 5, shooting from a motor vehicle. A "principal" is "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . ." (§ 31.) Based on that true finding, it is not clear on what theory the jury based its verdict.

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; see also *People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A person who aids and abets the commission of a crime is a principal in the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Lisea* (2013) 213 Cal.App.4th 408, 414; § 31.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Among the factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene, companionship, and conduct before and after the offense, including flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) But mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable

inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

There was sufficient evidence Allen, a Paybacc Gangster Crip, aided and abetted the assaults with a firearm and shooting from a motor vehicle. Allen, either on his own initiative or at Comeaux's request, stopped his vehicle alongside the victims. Allen then asked Dixon and Dilworth where they were from, a question leading to violence "99 percent of the time." He also asked why Dilworth wore shoes in a color associated with Bloods, namely, red or "dead-ass Chucks." It was reasonable to infer that Allen, a gang member, knew his questions would lead to a violent confrontation. Allen also fled the scene after the shooting.

In addition to fleeing the scene, neither before nor immediately after the shooting did Allen discuss what happened with Sergeant Fender, which suggests criminal involvement as opposed to one based on his being a confidential informant. Moreover, Fender said that there were specific scenarios under which Allen provided information. What happened here did not fit under either scenario, which also suggests that Allen was not acting as a confidential informant the night he was with Comeaux.

Despite this evidence that Allen aided and encouraged the crimes, he argues there was no evidence he knew that Comeaux intended to shoot Dixon and Dilworth. Comeaux, however, had just been turned away from Daniels's party. In response, he angrily got out of Allen's vehicle and lifted his shirt to display a gun. When Daniels's companion referenced the Bloods, Comeaux said he would "murk this nigger" and "this is BOP killer." Although Allen did not get out of the car, it is reasonable to infer he knew that Comeaux, a B.I.G. gang member, had a gun based on this evidence. Daniels's testimony bolstered that inference. He said that after Comeaux displayed the gun, Allen and Daniels talked about taking things easy and not having any trouble.

This same evidence supports Comeaux's liability for the crimes. Minutes before the shooting occurred, Comeaux, angry at being excluded from Daniels's party, displayed a gun. According to Keith, it was Comeaux who directed Allen to stop the vehicle alongside Dilworth and Dixon and who asked the victim about his red shoes. Keith also

11

saw Comeaux lean out of the window with a gun, and Jefferson identified Comeaux as the shooter. Dilworth and Dixon, although they initially identified Allen as the shooter, later said that the shots came from the rear of the vehicle. After the shooting, Comeaux fled the scene with the others and threatened Keith, telling her to keep her mouth shut or something would happen to her or her baby.

This evidence was more than sufficient to support the judgments against Comeaux and Allen.

## II. Denying the motion to sever did not violate defendants' due process rights.

Defendants next contend that the failure to sever their trials violated their due process rights. (U.S. Const., 5th, 6th &14th Amends.) We disagree.

Allen defended against the charges on the ground he was a police confidential informant targeting Comeaux, who was the shooter. Comeaux's defense was he was not in the car and, in any event, Allen was the shooter. Because each defendant's defense involved implicating the other, Comeaux moved to sever his trial from Allen's, and Allen joined the motion. The trial court denied the motion without prejudice on the ground there was no *Aranda-Bruton*[18] problem, because the prosecutor represented he would not introduce statements Allen made incriminating Comeaux. Thereafter, the trial judge rejected arguments that the defenses were antagonistic and would require Allen and Comeaux to defend against two prosecutors, that is, the People's prosecutor and each other. The court found that there was not a "clear enough showing" to overcome the preference for joint trials.

This preference for joint trials is a legislative one: "When two or more defendants are jointly charged with any public offense . . . they must be tried jointly, unless the court order[s] separate trials." (§ 1098.) This preference for joint trials is based on promoting economy and efficiency and serving the interests of justice by avoiding the " ' "scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) The "classic case" for joinder thus presents itself

---

[18] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

12

where the defendants are charged with crimes involving common crimes and victims. (*Ibid.*)

Severance, however, may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917, fns. omitted; see also *People v. Souza* (2012) 54 Cal.4th 90, 111.)  Severance is rarely compelled merely because codefendants present antagonistic defenses. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150; *Coffman and Marlow, supra,* 34 Cal.4th at p. 41.)  That defendants might attempt to fix blame on each other does not by itself require severance. (*Letner and Tobin,* at p. 150.)  Rather, the doctrine must be narrowly construed. (*People v. Hardy* (1992) 2 Cal.4th 86, 168, 169, fn. 19 [" 'That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial.  If one is lying, it is easier for the truth to be determined if all are required to be tried together' "].)  To obtain severance on this narrow ground, the defendant must demonstrate that the conflict is so prejudicial that the defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates both defendants are guilty. (*Coffman and Marlow*, at p. 41.)  "Stated another way, ' "mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations]" (*Hardy*, at p. 168.)

The denial of a severance motion is reviewed for an abuse of discretion, judged on the facts as they appeared at the time of the ruling. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 41.)  If the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have received a more favorable result in a separate trial. (*People v. Souza, supra,* 54 Cal.4th at p.109; *Coffman and Marlow*, at p. 41.)  Even if the ruling was correct when made, reversal is required if the defendant shows joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson* (1988) 47 Cal.3d 576, 590, overruled on another ground by

*People v. Reyes* (1998) 19 Cal.4th 743, 752-754; *People v. Ervin* (2000) 22 Cal.4th 48, 69.)

This was a "classic case" for joinder. Comeaux and Allen were charged with common crimes involving common events and the same victims. (*People v. Souza, supra,* 54 Cal.4th at p. 110.) The prosecutor also represented he would not introduce any statements made by Allen incriminating Comeaux, thereby obviating any *Aranda-Bruton* issue. The trial court therefore did not abuse its discretion by denying the severance motion.

Moreover, where sufficient independent evidence against the moving defendant exists, a conflict alone does not demonstrate guilt, and severance is not compelled. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 41; *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 150; *People v. Souza, supra,* 54 Cal.4th at p. 111.) In *Souza*, for example, the two defendants pointed the finger at each other, claiming the other fired the fatal shots. Eyewitness testimony and the physical evidence conflicted as to which defendant was the shooter. Despite the conflicting evidence and that defendant and his codefendant relied on antagonistic versions of the evidence, *Souza* found that the conflict alone did not demonstrate guilt. (*Souza*, at p. 111.) Because independent evidence, among other things, supported the moving defendant's participation in the events, defendant's due process rights were not violated by the failure to sever trial.

Allen and Comeaux also pointed the finger at each other. Allen's defense was he was working with Sergeant Fender as a confidential informant, and Comeaux was a target of their investigations. He denied knowing that Comeaux intended to shoot anyone that night. Comeaux denied being in the car that night. Allen's and Comeaux's defenses thus conflicted to the extent they claimed the other was the shooter. There was, however, sufficient independent evidence that Allen and Comeaux were guilty of the crimes. Allen was a Paybacc Gangster Crip. Comeaux was a B.I.G. gang member. Multiple people identified Allen as the vehicle's driver: Daniels, Keith, Dilworth, and Dixon. Dilworth and Dixon said that Allen, who they initially identified as the shooter, issued a gang challenge, "Where are you from?"

14

Keith, however, identified Comeaux as the shooter, and she said he threatened to harm her and her child if she said anything. Jefferson, who was in the car that night, also identified Comeaux as the shooter. Just before the shooting, Comeaux had been refused entry into Daniels's party because he refused to be patted down. Minutes before the shooting, Daniels saw Comeaux display a gun and get into the rear passenger seat behind the driver, Allen. And although Dilworth and Dixon initially identified Allen as the shooter, they testified at trial that the shots came from the rear of the vehicle.

Despite this independent evidence of their guilt, defendants, to demonstrate the alleged gross unfairness of the trial, cite examples of the other's attempts to undermine their defenses at trial,[19] the length of jury deliberations (approximately three days),[20] the jury's questions about aiding and abetting liability,[21] and multiple requests for read back. We fail to see, however, what evidence that was presented at Allen and Comeaux's joint trial would not have been presented at separate trials, and defendants do not specify how this matter would have been tried differently. (See *People v. Souza, supra,* 54 Cal.4th at p. 112.) Both still would have presumably denied being the shooter, and Allen would have claimed he was in the vehicle acting as a police confidential informant. It is therefore not clear that the outcome would have been different even if defendants had been separately tried.

It is also not apparent that accepting one defendant's defense would compel the jury to find the other guilty. The jury could have believed, for example, that someone in the car other than Allen and Comeaux was the shooter. The jury could have, for

---

**19** During Allen's cross-examination of Detective Simon, for example, the officer testified that the "first indication that we received that Mr. Comeaux was the shooter was during our first contact with Mr. Allen." Comeaux's counsel objected and the evidence was stricken.

**20** The jury began deliberating on November 12, 2010 at 3:45 p.m. and, after a weekend recess, rendered its verdict on November 17, 2010 in the afternoon.

**21** During deliberations, the jury asked: "In order to find a defendant guilty of aiding and abetting, do we have to find the other defendant guilty as the perpetrator?"

15

example, accepted Comeaux's defense he was not in the car *and* still believed that Allen was not the shooter. Or the jury could have believed that Allen was not the shooter and have found that someone in the rear of the car other than Comeaux was the shooter. The jury was also instructed on aiding and abetting. Under that theory of liability, either defendant could have been found guilty of the crimes even if the jury believed he was not the direct perpetrator.

We therefore conclude that the trial court did not abuse its discretion by denying the motion to sever and that defendants suffered no "gross unfairness" amounting to a violation of their due process rights.

## III.    The gang enhancement.

Defendants make two contentions concerning the gang allegations. First, there was insufficient evidence of the gangs' primary activities. Second, instructional error on the gang enhancement impermissibly lessened the prosecutor's burden of proof.

A.    *There was sufficient evidence to support the true finding on the gang allegation.*[22]

A " 'criminal street gang' " is any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more statutorily enumerated offenses, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.[23]  (§ 186.22, subd. (f); see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319-320, 323.)  These activities include, murder, attempted murder, and felony vandalism. (§ 186.22, subd. (e)(3), (20).) To establish the group's primary activities, the trier of fact may consider past offenses as well as the present, charged offenses.

---

[22]    We review the sufficiency of the evidence to support a true finding on an enhancement under the same standard we stated above in Discussion, Section I. (See *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)

[23]    A " 'pattern of criminal gang activity' " means "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of" statutorily enumerated offenses. (§ 186.22, subd. (e).)

(*Sengpadychith,* at p. 323.)  The offenses must be one of the group's "chief" or "principal" occupations, which necessarily exclude "the occasional commission of those crimes by the group's members."  (*Ibid.*; see also *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 [isolated criminal conduct is not enough]; *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [retaliatory shootings of a few individuals over a period of less than a week plus a beating six years earlier was insufficient to establish the requisite criminal activity].)  Sufficient proof of the gang's primary activities "might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."  (*Sengpadychith*, at p. 324.)  A gang expert's testimony may also provide sufficient evidence of a gang's primary activities.  (*Ibid.*; *People v. Gardeley* (1996) 14 Cal.4th 605 [gang expert testified that the defendant's gang primarily sold narcotics and intimidated witnesses, and he based his opinion on personal investigations into hundreds of gang-related offenses, conversations with the defendant and other gang members, and information from fellow officers and law enforcement agencies]; *People v. Vy, supra,* 122 Cal.App.4th at p. 1223.)

In *Vy*, evidence that the gang committed three predicate crimes over a short time period, including the charged crime, satisfied the primary activities prong of section 186.22, subdivision (f).  (*People v. Vy*, *supra*, 122 Cal.App.4th at pp. 1224-1225.)  But in *In re Alexander L., supra*, 149 Cal.App.4th 605, the gang expert's testimony was insufficient to establish the primary activities element of the gang enhancement. Although the expert said he knew that the gang had committed predicate crimes, "[n]o specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information.  He did not directly testify that criminal activities constituted [the gang's] primary activities.  Indeed, on cross-examination, [he] testified that the vast majority of cases . . . he had run across were graffiti related."  (*Id.* at pp. 611-612, fn. omitted.)

17

Here, Detective Rivera testified as the People's expert on primarily the Gardena Paybacc Crips, the gang to which there was evidence Allen belonged.[24] He said that Paybacc, as well as its clique, the Young Gangster Crips, committed drug and weapon sales, drug possession, robberies, burglaries, murder, carjacking, graffiti, and "probably a lot more." "I mean, like I said, the two years—two and a half years that I have been working as a gang investigator, I've worked tons—the variety of crimes that this gang is involved in. I mean, I can bring you up to a case that I have waiting for me on my desk when I get done with this case. It is anything from robberies to drug sales to weapons sales to violent crimes. You name it." Allen also admitted to Detective Simon that the gang committed "shootings, robberies and so forth."

In addition to these general statements about the gangs' activities, Detective Rivera testified about two predicate crimes committed by Paybacc members, a robbery by Bobby Evans in 2006, and possession of cocaine base for sale by Jasmine Kane in 2005. The detective therefore testified about wide-ranging criminal activity dating from at least 2005, the date of Kane's conviction, to the present, based on current cases the detective was investigating. And, in contrast to the conclusory testimony the expert in *Alexander L.* gave, Detective Rivera based his testimony on conversations he had with Paybacc members and his investigations into crimes they committed. His knowledge about Paybacc's activities also came from a confidential informant who was an "O.G.," an original gangster.

Detective Simon similarly provided an adequate foundation for his testimony about B.I.G.'s primary activities, which were narcotics possession (and possession for sale in particular), robbery, felony weapons possession, attempted murder, and vandalism. Detective Simon was familiar with B.I.G.'s criminal activities, because he investigated a robbery case involving B.I.G., and he was involved in investigating a shooting by a B.I.G. member, Cedric Parker. These prior crimes, in addition to the charged crimes, were sufficient evidence that B.I.G. consistently and repeatedly engaged

---

[24] There was also evidence Allen started Young Gangster Crips, a Paybacc subset or clique.

in the requisite criminal activity. And, unlike the expert in *Alexander L.*, Detective Simon based his testimony on multiple contacts with B.I.G. members and on conversations with other officers about the gang, as well as his personal investigation into their crimes.

### B.   *Instructional error.*

Defendants next contend that the modified version of CALCRIM No. 1401 failed to properly instruct jurors and lessened the prosecution's burden of proof, requiring reversal of the gang enhancement findings.

Their first claim of error is that the instruction incorrectly told the jury that the gangs' primary activities could include commission of offenses not specified in section 186.22, subdivisions (e) and (f). The trial court's instruction on this element included as qualifying offenses the commission of "vandalism" and "illegal weapon possession and weapon sales."[25] Although felony vandalism is a qualifying offense in the gang enhancement statute, misdemeanor vandalism is not. (§ 186.22, subd. (e)(20).) Similarly, only certain weapons possession or sales qualify as primary activities.

---

[25]   Pursuant to CALCRIM No. 1401, the jury was instructed:   "A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal:  [¶] 1. That has a common name or common identifying sign or symbol; [¶] 2. *That has, as one or more of its primary activities, the commission of robbery, attempted murder, vandalism, narcotics possession for sale, illegal weapon possession, and weapon sales*; [¶] and [¶] 3. Its members, whether acting alone or together, engaged in or have engaged in a pattern of criminal gang activity.  [¶]  In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"A pattern of criminal gang activity, as used here, means:  [¶]  1. The commission of, attempted commission of, or conviction of any combination of two or more of the following crimes:  burglary, attempted murder, robbery, possession of narcotics for sale . . . ."  (Italics added.)

(§§ 186.22, subd. (e), 12072, 12101, 12021, 12025, 12031.)[26] The instruction therefore was erroneous.

We nonetheless find that the error in listing vandalism and weapons possession or sales as potential primary activities was harmless beyond a reasonable doubt, under the test in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 324 ["What harmless error standard governs a trial court's failure to instruct the jury on the primary activities element of the criminal street gang enhancement provision . . . depends on whether the enhancement provision increases the maximum possible penalty for the underlying crime].) The trial court's instruction on the primary activities element included for consideration robbery, attempted murder, and narcotics possession for sale. The evidence showed commission of these offenses by members of Allen's and Comeaux's gangs. Evans, a Paybacc member, was convicted of robbery in 2006. Kane, also a Paybacc member, was convicted of possession of cocaine base for sale in 2005. Detective Rivera indicated he had investigated a range of crimes involving Paybacc: "It is anything from robberies to drug sales to weapons sales to violent crimes." Allen also admitted to Sergeant Fender that his gang committed shootings and robberies. As to B.I.G., Detective Simon investigated a robbery involving B.I.G. and an attempted murder by a B.I.G. member. In closing argument, the prosecutor did not focus on or highlight vandalism or weapons possession and sales as primary activities. In light of all this, we conclude, beyond a reasonable doubt, that the jury would not have relied solely on evidence of weapons possession and sales and "vandalism" to support the gang enhancement.

---

[26]    As an initial matter, defendants neither objected to the instruction nor requested clarifying or amplifying instructions. Having failed to do so, they may have forfeited the claim on appeal. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "]; *People v. Lang* (1989) 49 Cal.3d 991, 1024.)

Defendants next contend that the trial court failed to instruct on the elements of the of felony vandalism and illegal weapon possession and weapons sales. "The court should also give the appropriate instructions defining the elements of crimes inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions." (CALCRIM No. 1401, Bench Notes.) Felony vandalism and illegal weapon possession and weapons sales were neither established by prior convictions nor charged in the present case. Therefore, the jury should have been instructed on the elements of those crimes.

Section 186.22, subdivision (f), however, states the prosecution need only prove one crime as a primary activity. The crimes of robbery, attempted murder, and narcotics possession were established by the prior convictions of B.I.G. or Paybacc members Evans, Kane, and Parker, and therefore those crimes needed no further definition. And because the defendants were charged with attempted murder, the jury was separately instructed on the elements of that crime. Since the jury had sufficient evidence to establish the gangs' primary activities without considering felony vandalism or illegal weapons possession and sale as necessary predicate offenses, the trial court's failure to define their elements was harmless beyond a reasonable doubt. (*People v. Sengpadychith, supra*, 26 Cal.4th at p. 326.)

## IV.     The trial court did not give an improper *Allen* instruction.

The jury began deliberating on Friday, November 12, 2010, in the afternoon. On Monday, November 15, the jury asked to see police reports, for read back of Jefferson's testimony, and a question about aiding and abetting liability. The next day, November 16, in the morning session, the jury indicated it was "hopelessly 'Hung' " on all counts. Over the objections of both defense counsel, the trial court gave what defendants contend were "dynamite" or "*Allen*"[27] charges that pressured the jury into reaching a guilty verdict.

---

[27]     *Allen v. United States* (1896) 164 U.S. 492.

An *Allen* charge or instruction is one that either "encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them" or "states or implies that if the jury fails to agree the case will necessarily be retried." (*People v. Gainer* (1977) 19 Cal.3d 835, 852, disapproved in part by *People v. Valdez* (2012) 55 Cal.4th 82, 163; see also *Jenkins v. United States* (1965) 380 U.S. 445, 446 [instructing a deadlocked jury it has to reach a decision is coercive].) A court, however, may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a reasonable probability of agreement. (*People v. Pride* (1992) 3 Cal.4th 195, 265; *People v. Breaux* (1991) 1 Cal.4th 281, 319.)

A claim that the trial court pressured a jury into reaching a verdict depends on the particular circumstances of the case. (*People v. Pride, supra*, 3 Cal.4th at p. 265.) Thus, when reviewing a coercion claim, we examine "whether or not the court's remarks in sending the jury back for further deliberations indicate[] an opinion on his part as to the guilt or innocence of the defendant, and whether the court creates the impression that in his mind the jury ought to convict." (*People v. Diaz* (1962) 208 Cal.App.2d 41, 50.)

The trial court here gave these instructions after the jury said it was deadlocked:

"It has been my experience on more than one occasion that the jury which initially reported it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it. [¶] To assist you in your further deliberations, I am going to further instruct you as follows:

"Your goal as jurors should be to reach a fair and impartial verdict if you are able [to] do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so. [¶] It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial; to discuss your views regarding the evidence; and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change your view you once held if you are convinced it is wrong, or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views. As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with a goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment. Both the People and the defendant—in this case it will be 'the defendants'—are entitled to the individual judgment of each juror.

"If there was anything that this court can do to assist you in performing your duties, please do not hesitate to let me know.

"At your request, you can be provided with read back of testimony, further explanation of legal concepts, further instructions, or further argument by the attorneys on any point or topic you request.

"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate. May I suggest that, since you have not been able to arrive at a verdict using the methods . . . you have chosen, that you consider to change the methods you have been following, at least temporarily, and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present the other side's position and vice versa. This might enable you to better understand the other's position.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberation. I merely find you may find it productive to do whatever is necessary to

23

ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you re-read CALCRIM instruction 200 and CALCRIM instruction 3550. These instructions pertain to your duties as jurors, to make recommendations on how you should deliberate.

"The integrity of a trial requires that jurors at all times during your deliberations conduct themselves as required by the instructions. The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source.

"A fact is something proved by the evidence or by stipulation.

"Second, you must apply the law as I state to you, to the facts, as you determine them and in this way arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"CALCRIM [No.] 3550 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict."

The trial court also instructed the jury with CALJIC No. 17.41: "The attitude and conduct of jurors are very important. It is rarely helpful for a juror[] at the beginning of deliberations to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may be aroused, and one may hesitate to change a position even if shown it is wrong. Remember you are not partisans or advocates in this matter. You are impartial judges of the facts.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you. I hope my comments and suggestions may have some assistance to you.

"You are ordered to continue your deliberations at this time. If you have other questions, concerns, requests, or any communications you desire to report to me, please put them in writing on the form my bailiff has provided you with. . . ."

At least one Court of Appeal found that nearly identical instructions did not constitute an improper *Allen* charge. (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-1120.) *Moore* found that the instructions did not improperly tell the jurors that the case must at some time be decided, and they were not designed to coerce the jury into returning a verdict. (*Id.* at p. 1121.) Rather, the instructions in *Moore*, like the ones here, directed jurors to "consider carefully, weigh and evaluate all of the evidence presented at trial" and to listen and consider the views of fellow jurors. (*Ibid.*) Unlike the instructions in *Allen*, which our California Supreme Court in *Gainer* disapproved, the instructions did not encourage minority jurors to reexamine their views in light of the majority's. The trial court's suggestion that the jurors might want to consider "changes in your methods of deliberations" was not a directive about how deliberations should be conducted or what the result must be. Our California Supreme Court has also held that CALJIC No. 17.41 does not infringe on a defendant's federal or state constitutional right to trial by jury or the state constitutional right to a unanimous verdict. (*People v. Engelman* (2002) 28 Cal.4th 436, 439-440.)

We therefore conclude that the trial court did not err or violate defendants' constitutional rights by giving the additional instructions.

## V. The trial court had no duty to give a unanimity instruction with respect to the gang enhancement.

Because the prosecutor presented evidence that more than one gang benefitted from defendants' crimes, they contend that the trial court, sua sponte, should have given a unanimity instruction to obviate any juror disagreement about which gang or gangs

25

benefitted. Without a unanimity instruction, defendants argue, the jurors were permitted to "amalgamate the evidence of [their] association with, direction from and desire to benefit more than one different gang." We conclude that a unanimity instruction was not warranted.[28]

A jury verdict in a criminal case must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) When evidence suggests that a defendant committed more than one discrete crime, the prosecutor must elect among the crimes or the court must require the jury to agree on the same criminal act. (*Ibid.*; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) " 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.] [¶] On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*Russo*, at p. 1132.) A unanimity instruction thus " 'focuses the jury's attention on a specific act and requires the jury to determine guilt as to that act beyond a reasonable doubt.' [Citation.] The rule is limited by its rationale: 'A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.' [Citation.] The same reasoning should, in general, apply to enhancements as well as the crimes that underlie them." (*People v. Robbins* (1989) 209 Cal.App.3d 261, 264-265.)

This reasoning does not apply to gang enhancements in the manner defendants suggest. The rationale underlying the requirement of unanimity is a jury must agree that the defendant committed the same criminal act. (*People v. Russo, supra,* 25 Cal.4th at p. 1132.) But the "criminal act" must be distinguished from the " 'theory' whereby the

---

**28**     We review a claim of instructional error de novo. (See *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

defendant is guilty." (*Ibid.*) In murder cases, for example, a jury must agree on the defendant's guilt for a specific murder but need not agree whether it was premeditated murder or felony murder. (*Id.* at pp. 1132-1133; *People v. Pride, supra,* 3 Cal.4th at pp. 249-250; see also *People v. Santamaria* (1994) 8 Cal.4th 903, 918-919 [jury need not unanimously decide whether the defendant was guilty as an aider and abettor or direct perpetrator].) Thus, there is a "dichotomy between a specific crime and a theory of the case." (*Russo*, at p. 1133.)

Which gang or gangs benefitted from defendants' crimes is more akin to a "theory of the case" as opposed to a specific "act" or "crime" on which the jury must unanimously agree. To find the gang enhancement true, the jury was instructed it had to find that defendants committed crimes for the gang's benefit, or at the direction of or in association with a gang and that the defendant intended to assist, further or promote criminal conduct by gang members. (*People v. Gardeley, supra,* 14 Cal.4th at pp. 622, 625.)[29] The "act" or "crime" the jurors therefore had to unanimously agree on was that defendant committed crimes to benefit a gang with the intent to do so. Which *specific* gang benefitted, where, as here, there is evidence more than one gang benefitted, is not the relevant issue.

At least one Court of Appeal has so found. *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1357, found that there was sufficient evidence Norteños was a criminal street gang and the murder at issue was related to the gang's activity, although the gang expert testified that there were thousands of Norteños in the Sacramento area, in 20 to 25 subsets. (*Id.* at pp. 1356-1357.)[30] To find the gang allegation true, it was unnecessary for the prosecutor to prove to which subset the defendant belonged. *Ortega*

---

[29] We presume a jury understood and followed the court's instruction. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.)

[30] Our California Supreme Court has granted review of *People v. Prunty* (2013) 214 Cal.App.4th 1110, review granted June 26, 2013, S210234, on this issue: Is evidence of a collaborative or organizational nexus required before multiple subsets of the Norteños can be treated as a whole for the purpose of determining whether a group constitutes a criminal street gang within the meaning of Penal Code section 186.22, subdivision (f)?

then rejected the defendant's argument that a unanimity instruction was required as to which gang was involved: "The name of a gang is not a criminal act. There was no evidence that defendant[s] belonged to any gang other than the Norteño gang, thus there was no possibility the jury was in disagreement about the gang with which defendant associated. There was no need for a unanimity instruction." (*Id.* at p. 1357.)

We have similarly concluded that there was sufficient evidence that Paybacc, Young Gangster Crips, and B.I.G. were criminal street gangs and would benefit from Allen's and Comeaux's criminal activities. Once the jury found here that defendants were active members of a street gang and that they committed murder for the benefit of a street gang, it was irrelevant whether the specific beneficiary of the crime was one or more these gangs. No unanimity instruction was necessary.

## VI. Ineffective assistance of counsel.

A defendant claiming ineffective assistance of counsel must establish both error and prejudice. (See generally, *Strickland v. Washington* (1984) 466 U.S. 668.) Because we have concluded that no error or prejudice occurred as a result of any alleged failure of trial counsel to preserve error, we reject any claim made on appeal that they rendered ineffective assistance.

## VII. Cumulative error.

Defendants contend that the cumulative effect of the purported errors deprived them of a fair trial. As we have " 'either rejected on the merits defendant[s'] claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

## VIII. Sentencing error.

The jury found defendants guilty of count 5, shooting from a motor vehicle and found true the allegation that a principal discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)) and found true a gang allegation (§ 186.22, subd. (b)). The jury found not true a personal gun use allegation. The trial court sentenced both defendants to 25-years-to-life each for the gun enhancements *and* imposed and stayed

28

five-year terms for the gang enhancement.  But the gang enhancement may not be imposed where, as here, the personal gun use allegation was found not true.  "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."  (§ 12022.53, subd. (e)(2); see also *People v. Brookfield* (2009) 47 Cal.4th 583, 595.)

The People concede, and we agree, that the five-year-terms therefore must be stricken.

## DISPOSITION

The five-year terms imposed under section 186.22, subdivision (b), are stricken as to both defendants.  The clerk of the superior court is directed to modify the abstract of judgment and to forward a copy of the modified abstract of judgment to the Department of Corrections.  The judgment is affirmed as modified.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


CROSKEY, Acting P. J.


KITCHING, J.