[No. C067767. Third Dist. Jan. 31, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
EDUARDO LISEA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of all of parts I., II., IV., and V. of the Discussion.

COUNSEL

Randy S. Kravis, under appointment by the Court of Appeal; and Michael E. Platt for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BUTZ, Acting P. J.—After an initial jury deadlocked, a second jury, upon retrial, convicted defendant Eduardo Lisea of attempted murder, assault with a firearm, and criminal street gang participation, but acquitted him of permitting another to shoot from a vehicle. (Pen. Code, §§ 664, 187, subd. (a), 245, subd. (a)(2), 186.22, subd. (a), former § 12034, subd. (b), respectively.)[1] The jury also found true some gang enhancements, but found not true that defendant had personally used or discharged a firearm. Defendant was sentenced to state prison for 32 years to life.

The prosecution's main theory was that defendant—during a confrontation between his gang and a rival gang that resulted in the shooting of an innocent bystander—aided and abetted the offenses specified above, which were the natural and probable consequence of the offenses he had committed, disturbing the peace or simple assault.

In the published portion of this opinion, we conclude that defendant, as a convicted aider and abettor of the attempted murder under the natural and probable consequences doctrine, is a "principal" within the meaning of the section 12022.53, subdivision (e)(1) (hereafter section 12022.53(e)(1)) 25-year-to-life gang firearm enhancement. (§ 12022.53, subds. (a)(1), (18), (d) & (e)(1).)

In the unpublished portion of this opinion, we examine defendant's other challenges and find no basis for reversal. Those challenges focus on the natural and probable consequences doctrine, the evidence that a rival gang member may have been the shooter, and the trial court's failure to instruct on self-defense and on attempted voluntary manslaughter based on imperfect self-defense or heat of passion. Accordingly, we shall affirm the judgment.

---

[1] Undesignated statutory references are to those sections of the Penal Code in effect at the time of defendant's 2008 crimes, unless otherwise indicated.

## FACTUAL BACKGROUND

On May 9, 2008, members of the Sureños and Norteños street gangs clashed in the parking lot of a Stockton grocery store, resulting in an innocent bystander, then 18-year-old Christopher Smith, being shot in his right eye.

*Independent Witness Accounts*

The confrontation actually began inside the store when defendant, a Sureño, made provocative comments and threw gang signs to two Norteños members, Jonathan Pimentel and Billy Ray Cook, amid Pimentel's display of colors (red).

The confrontation continued into the parking lot, with Cook shouting at defendant and his companions. Both groups then pushed shopping carts at one another. A bystander, referring to defendant's group, yelled, "They have a gun." After this utterance, Pascual Pimentel (Jonathan's father and a member of the Norteños group) displayed a "Norte" tattoo to defendant and his crew.[2]

Two witnesses—N.D. (the victim Christopher Smith's then nine-year-old brother) and Justine Tango—saw Pascual run to a green SUV, grab a gun (Tango was not sure what was grabbed), and apparently run back to the altercation; shortly after this, these two witnesses heard three gunshots from positions of cover. Three other witnesses—Cynthia Stolt, Melissa Langford and Albert Harps—supported this account; these three witnesses, again, heard but did not see the firing. Another witness, Deyanira Andrade, saw Pascual run by her car and later heard three gunshots in rapid succession (although Andrade believed the shots came from the area in which defendant's group was congregating, she never actually saw a gun).

Four other witnesses—then 12-year-old A.H., Jesus Lomeli, Jose Lomeli, and the victim himself, Christopher Smith—saw gunshots being fired toward the Norteños group at the front of the grocery store from defendant's blue Chevrolet pickup truck as it drove from the scene.

Finally, Juan Trejo saw the two groups arguing in the parking lot, and heard one of the arguers say, "Let's get out of here . . . . They have a cuete [(Spanish for gun)] in the truck." Trejo and his companion, Carlos Chitiva, later saw a man, who was wearing a red shirt, running through the parking lot alongside a Chevrolet pickup holding one hand in his waistband (as if he had a gun) and cursing. They both heard several rapid gunshots, which came from the parking lot behind them (they were facing the store).

---

[2] Because they share the same last name, we will refer to Jonathan and Pascual Pimentel by their first names.

*Physical Evidence*

The hands of Cook, Pascual, and Jonathan (i.e., the Norteños members) tested positive for gunshot residue.

Two possible bullet strikes were found on the exterior front wall of the grocery store. Nearby, a mushroomed bullet (consistent with having hit a wall) was found; this bullet matched a bullet fragment removed from victim Smith's head—both were fired from the same gun, a .32 caliber.

About a month before the shooting, police officers found two bullet shell casings in defendant's Chevrolet pickup truck: a .32-caliber casing in the pickup bed, and a nine-millimeter casing in the driver's door pocket.

*Defendant's Statements and Gang Evidence*

In a police interview, defendant initially denied that anyone had fired a gun from his truck. Eventually, though, defendant said that as he pulled his truck out of the parking lot, two or three Norteños chased after the truck on foot and reached into their clothing as if they were concealing something. After defendant turned right (apparently in exiting the lot), one of his passengers, "Cornejo," fired at the Norteños from the middle of the front seat. Cornejo fired more than two shots. Defendant grabbed Cornejo's arm, trying to stop the firing and calm Cornejo. When they returned to defendant's house, defendant confronted Cornejo about the shooting.

In his trial testimony, defendant stated that he, Eric Espinoza, and Jose Pineda drove to the grocery store in his mother's 2006 Chevrolet/GMC truck. The altercation outside the store occurred, with the other group as the aggressor, pushing shopping carts and making threats. In response, Espinoza flashed a pocketknife to ward them off. Defendant, Espinoza and Pineda climbed into defendant's truck and drove off; they did notice, however, that Pascual was running after them holding a gun at his waist. Pascual was about 55 to 60 feet away. Defendant did not slow down, he was "panicked"; his friends were screaming to step on the gas because "[Pascual] has a gun," and he ducked down as he drove. Defendant did not hear any gunshots. Defendant, however, did not tell the police in his interview this specific information about Pascual, although he was asked if he had seen anyone with a gun or anyone shooting.

Based on a variety of factors, two police gang experts opined that defendant was a Sureños gang member on the date of the offense, and they provided a context to this gang confrontation.

## DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III.   *The 25-year-to-life Enhancement Under Section 12022.53(e)(1) Is Legally Authorized Because Defendant Was a Principal in the Attempted Murder*

Defendant contends that his enhancement sentence of 25 years to life under section 12022.53(e)(1) must be reversed because the jury may have found him only vicariously liable for the qualifying offense of attempted murder under the natural and probable consequences doctrine, and therefore he cannot be deemed a principal in that offense. We disagree.

We conclude that the term "principal" in section 12022.53(e)(1) includes aiders and abettors under the natural and probable consequences doctrine. As we shall explain, three reasons underlie our conclusion: California law has long recognized that aiders and abettors are principals; California law has long recognized that aiders and abettors include those acting under the natural and probable consequences doctrine; and such a conclusion furthers the purpose of the section 12022.53(e)(1) enhancement to counteract the serious threat to Californians posed by gang members using firearms.

We start our analysis with the relevant language of section 12022.53(e)(1):

"The enhancements provided in this section [including the subdivision (d) enhancement of 25 years to life for personally and intentionally discharging a firearm causing great bodily injury or death] shall apply to any person who is a principal in the commission of an offense [(i.e., the serious felony offenses enumerated in § 12022.53, subd. (a), which include attempted murder)] if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22 [(i.e., committed the § 12022.53-enumerated offense for the benefit of a criminal street gang with the specific intent to further criminal conduct by gang members)]. [¶] (B) Any principal in the [enumerated] offense committed any act specified in subdivision . . . (d)."

Defendant in effect concedes that he meets all the criteria for this enhancement if, under the law, he is deemed a "principal" in the attempted murder offense as an aider and abettor under the natural and probable consequences doctrine. He is.

*See footnote, *ante,* page 408.

■ Since 1872, the term "principal" has been defined in California statutory law, as relevant here, as including "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . ." (§ 31.) California statutory law has also stated, since 1872 as well, "The parties to crimes are classified as: [¶] 1. Principals; and, [¶] 2. Accessories [after the fact]." (§ 30; see § 32; *People v. Talbott* (1944) 65 Cal.App.2d 654, 660–661 [151 P.2d 317] ["A defendant in a criminal action therefore is convicted as a principal or accessory or not at all; and in this connection, the fact that principals may be conspirators is immaterial."].)

■ And, as explained by our state high court, the natural and probable consequences doctrine constitutes a type of aiding and abetting. "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.2d 1210], quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 260 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (*Prettyman*).) This has been the law in California for over a century, since our state high court embraced the natural and probable consequences doctrine of aiding and abetting in *People v. Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861] (*Kauffman*). (See *Prettyman, supra*, 14 Cal.4th at pp. 260–261.)

In addition to section 31, which, as noted, has defined a "principal" to include an aider and abettor since 1872, and *Kauffman*, which, as noted, has embraced the natural and probable consequences doctrine of aiding and abetting since 1907, we find section 971. As pertinent, section 971 has substantively stated, from 1872 onward, that "all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals . . . ." (See *Bompensiero v. Superior Court* (1955) 44 Cal.2d 178, 186 [281 P.2d 250] ["Reasonably construed, [the former substantively similar section 971] expresses a legislative intent to abolish the distinctions made at common law as to the various types of participants in the commission of a crime and to make all of them subject to the same procedural and substantive limitations."].)

The point is, for over a century, the term "principal" in California criminal law has effectively included an aider and abettor under the natural and probable consequences doctrine. It is against this storied background that, in 1997, the Legislature used the unadorned term "principal" in the enhancement statute at issue here, section 12022.53(e)(1). The Legislature knew what

it was doing in this regard; indeed, one might say the Legislature was standing on "principal." Consequently, an aider and abettor under the natural and probable consequences doctrine is a principal within the meaning of section 12022.53(e)(1).

■ Defendant concedes that one who *directly* aids and abets an offense is a "principal" under section 12022.53(e)(1)—i.e., one who, with *knowledge* of the perpetrator's unlawful purpose and with the *intent* of committing or facilitating the commission of the offense, by *act or advice aids* the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) Defendant argues, however, that this does not describe the aider and abettor under the vicarious liability theory of the natural and probable consequences doctrine.

An aider and abettor under the natural and probable consequences doctrine, though, must know of and intend to assist the perpetrator's target crime (or must commit the target crime himself), *and* the nontarget crime must be a reasonably foreseeable consequence of that target crime. (*Prettyman, supra,* 14 Cal.4th at p. 261; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1583 [11 Cal.Rptr.2d 231].) The natural and probable consequences doctrine is based on the recognition that " 'aiders and abettors should be responsible for the criminal harms *they have naturally, probably and foreseeably put in motion.*' " (*Prettyman, supra,* 14 Cal.4th at p. 260, italics added, quoting *People v. Luparello* (1986) 187 Cal.App.3d 410, 439 [231 Cal.Rptr. 832].)

In *People v. Gonzales* (2001) 87 Cal.App.4th 1 [104 Cal.Rptr.2d 247] (*Gonzales*), the Second Appellate District, Division Four, rejected an argument similar to the one defendant makes here concerning the culpability of an aider and abettor under the natural and probable consequences doctrine. In *Gonzales*, the defendant contended the section 12022.53(e)(1) enhancement violates federal due process because " 'it permits a non-gun-using defendant in a gang case who is convicted of first degree murder as the natural and probable consequence of a *simple assault,* to be sentenced more severely than a person guilty as an accomplice to first degree murder, and it permits this result *without any requirement that the jury find that the defendant knew or intended that the homicide be committed by the use or discharge of a firearm.*' " (*Gonzales,* at pp. 13–14, underscoring omitted, italics added.)

In rejecting this argument, the *Gonzales* court reasoned that section 12022.53(e)(1) "is expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang"; and that "[defendant Gonzales's] argument is contrary to aider and abettor jurisprudence in California. [As for aiders and abettors under the natural and

probable consequences doctrine,] the only requirement is that the aider and abettor intend to facilitate the target offense and that the offense ultimately committed is the natural and probable consequence of the target offense." (*Gonzales, supra,* 87 Cal.App.4th at p. 15.) *Gonzales* also emphasized the harm at which this enhancement was directed: "The Legislature has chosen to severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang. It has done so in recognition of the serious threats posed to the citizens of California by gang members using firearms." (*Id.* at p. 19.)

Through this reasoning, *Gonzales* recognized that the section 12022.53(e)(1) enhancement—by incorporating the criminal street gang finding of section 186.22, subdivision (b) as a required element—applies in the aiding and abetting context only to an aider and abettor of an enumerated serious felony *who does so for the benefit of a criminal street gang and with the specific intent to further criminal conduct by gang members.* (§§ 12022.53(e)(1)(A), 186.22, subd. (b)(1).) (The jury made these gang findings with respect to defendant's attempted murder conviction.)

Citing *Gonzales* approvingly, our state Supreme Court, in *People v. Garcia* (2002) 28 Cal.4th 1166 [124 Cal.Rptr.2d 464, 52 P.3d 648], concluded, in a driveby gang shooting case, that "the Legislature has expressed its clear intent to punish aiders and abettors . . ." pursuant to the enhancement under section 12022.53, subdivisions (d) and (e)(1), even where, as in *Garcia,* the shooter was acquitted of all charges. (*Garcia,* at pp. 1173, 1170.)

■ In light of the long-standing recognition in California law that aiders and abettors are principals and that those acting under the natural and probable consequences doctrine are aiders and abettors, and given that the section 12022.53(e)(1) enhancement is directed at the serious gang firearm threat in California, we conclude that the term "principal" in the section 12022.53(e)(1) enhancement includes aiders and abettors under the natural and probable consequences doctrine.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 408.

## DISPOSITION

The judgment is affirmed.[3]

Mauro, J., and Duarte, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 1, 2013, S209122.

---

[3] We deny defendant's request to take judicial notice that the Pimentels were charged separately from defendant with firearm discharge in this shooting. Defendant asserts these charges support his argument that there was substantial evidence of self-defense here. Defendant claims these charges were dismissed when defendant was sentenced.