Filed 1/28/22 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re EDUARDO LISEA on Habeas Corpus. | C093386<br><br>(Super. Ct. No. STKCRFMISC201916983, SF111155A)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of San Joaquin County, Seth R. Hoyt, Judge.  Reversed with directions.

Robert J. Beles, Retained Counsel for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Clara M. Levers, Deputy Attorneys General, for Respondent.

1

THE COURT:

It is ordered that the opinion filed herein on January 13, 2022, be modified as follows:

The sentence prior to the section titled "FACTUAL AND PROCEDURAL BACKGROUND" is modified to read: Finding the other contentions mooted or without merit, we shall vacate the attempted murder conviction, reverse the sentence, and remand for additional proceedings.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in judgment.

_____\s_____,
BLEASE, Acting P. J.

We concur:

_____\s_____,
MAURO, J.

_____\s_____,
KRAUSE, J.

2

Filed 1/13/22 (unmodified opn.)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re EDUARDO LISEA on Habeas Corpus. | C093386<br><br>(Super. Ct. No. STKCRFMISC201916983, SF111155A) |

APPEAL from a judgment of the Superior Court of San Joaquin County, Seth R. Hoyt, Judge. Reversed with directions.

Robert J. Beles, Retained Counsel for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Clara M. Levers, Deputy Attorneys General, for Respondent.

The petition for writ of habeas corpus filed in this court by petitioner Eduardo Lisea presents an unusual application of the Supreme Court decision addressing the kill zone instruction for attempted murder in CALCRIM No. 600, *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).

This case stems from a confrontation between petitioner's gang and a rival gang in which an innocent bystander was shot. Petitioner, the driver of the vehicle from which his fellow gang members fired several shots, was convicted of attempted murder, assault with a firearm, criminal street gang participation (Pen. Code,[1] §§ 664, 187, subd. (a), 245, subd. (a)(2), 186.22, subd. (a)), gang and firearm enhancements (§§ 186.22, subd. (b)(1), 12022.53, subd. (d), 12022, subd. (a)(1), 12022.53, subds. (d) (e) (1)) and was sentenced to 32 years to life.[2] (*Lisea, supra*, 213 Cal.App.4th 408, 410.) The primary prosecution theory was that petitioner aided and abetted these offenses, which were the natural and probable consequence of disturbing the peace or simple assault. (*Ibid.*)

We affirmed the judgment on appeal, finding in the published part of our opinion that a person convicted as an aider and abettor is a "principal" for the purposes of section 12022.53, subdivision (e), while rejecting his remaining contentions in the unpublished part of our opinion. (*Lisea, supra*, 213 Cal.App.4th at p. 410.)

On July 7, 2014, petitioner filed a petition for writ of habeas corpus in San Joaquin County Superior Court, which was denied.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The Attorney General requests we take judicial notice of the record in petitioner's appeal from his conviction (*People v. Lisea* (2013) 213 Cal.App.4th 408 (*Lisea*)) and in the prior habeas proceeding in this court (*In re Lisea* (Nov. 10, 2019, C078310) [nonpub. opn.] (C078310)). We construe the request to be a motion to incorporate these records by reference and grant the motion as construed by this court. (Cal. Rules of Court, rule 8.147(b).)

On January 29, 2015, petitioner filed a petition for writ of habeas corpus with this court, which was subsequently denied. (C078310, order Mar. 26, 2015) The Supreme Court granted review and subsequently remanded the case to this court with directions to vacate our decision and reconsider the matter in light of *Canizales*. (C078310, order Sept. 18, 2019) On remand, this court vacated the denial (C078310, order Dec. 2, 2019) and issued an order to show cause returnable to the superior court. (C078310, order Dec. 10, 2019)

The superior court denied the petition for writ of habeas corpus in a written ruling on March 20, 2020.

Defendant then filed a petition for writ of habeas corpus with this court on January 21, 2021. He asserts: (1) there was insufficient evidence to give a kill zone instruction, a prejudicial error requiring reversal of his attempted murder conviction; (2) allowing him to be liable for the section 12022.53 enhancement as a principal violated his due process right to adequate notice; (3) the failure to instruct the jury on attempted involuntary manslaughter violated his due process rights; (4) cumulative error warrants reversal; and (5) appellate counsel was ineffective in failing to raise issues raised in the habeas petition.

The instruction here, which listed the attempted murder victim as the primary target, differs from the kill zone instruction in *Canizales* and other cases finding erroneous kill zone instructions. *Canizales*, which applies retroactively, is nonetheless applicable here. The instruction in this case, when combined with the prosecutor's arguments concerning it, presented the same problem that led to reversing the conviction in *Canizales*. The instruction allowed the jury to use circumstantial evidence to infer an intent to kill the victim when that same circumstantial evidence can support a reasonable inference of no intent to kill. As in *Canizales*, this error is prejudicial, warranting the reversal of the attempted murder conviction. Since there is substantial evidence to support an attempted murder conviction, petitioner may be retried for the crime. Finding

3

the other contentions mooted or without merit, we shall vacate the murder conviction, reverse the sentence, and remand for additional proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

We take the relevant background from our published opinion denying petitioner's appeal, and supplement where necessary from the appellate record.

*1. The Crimes*

"*Independent Witness Accounts*

"The confrontation actually began inside the store when defendant, a Sureño, made provocative comments and threw gang signs to two Norteños members, Jonathan Pimentel and Billy Ray Cook, amid Pimentel's display of colors (red).

"The confrontation continued into the parking lot, with Cook shouting at defendant and his companions. Both groups then pushed shopping carts at one another. A bystander, referring to defendant's group, yelled, "They have a gun." After this utterance, Pascual Pimentel (Jonathan's father and a member of the Norteños group) displayed a "Norte" tattoo to defendant and his crew.

"Two witnesses—N.D. (the victim Christopher Smith's then nine-year-old brother) and Justine Tango—saw Pascual run to a green SUV, grab a gun (Tango was not sure what was grabbed), and apparently run back to the altercation; shortly after this, these two witnesses heard three gunshots from positions of cover. Three other witnesses—Cynthia Stolt, Melissa Langford and Albert Harps—supported this account; these three witnesses, again, heard but did not see the firing. Another witness, Deyanira Andrade, saw Pascual run by her car and later heard three gunshots in rapid succession (although Andrade believed the shots came from the area in which defendant's group was congregating, she never actually saw a gun).

"Four other witnesses—then 12-year-old A.H., Jesus Lomeli, Jose Lomeli, and the victim himself, Christopher Smith—saw gunshots being fired toward the Norteños group

4

at the front of the grocery store from defendant's blue Chevrolet pickup truck as it drove from the scene.

"Finally, Juan Trejo saw the two groups arguing in the parking lot, and heard one of the arguers say, "Let's get out of here . . . . They have a cuete [(Spanish for gun)] in the truck." Trejo and his companion, Carlos Chitiva, later saw a man, who was wearing a red shirt, running through the parking lot alongside a Chevrolet pickup holding one hand in his waistband (as if he had a gun) and cursing. They both heard several rapid gunshots, which came from the parking lot behind them (they were facing the store).

"*Physical Evidence*

"The hands of Cook, Pascual, and Jonathan (i.e., the Norteños members) tested positive for gunshot residue.

"Two possible bullet strikes were found on the exterior front wall of the grocery store. Nearby, a mushroomed bullet (consistent with having hit a wall) was found; this bullet matched a bullet fragment removed from victim Smith's head—both were fired from the same gun, a .32 caliber.

"About a month before the shooting, police officers found two bullet shell casings in defendant's Chevrolet pickup truck: a .32-caliber casing in the pickup bed, and a nine-millimeter casing in the driver's door pocket.

"*Defendant's Statements and Gang Evidence*

"In a police interview, defendant initially denied that anyone had fired a gun from his truck. Eventually, though, defendant said that as he pulled his truck out of the parking lot, two or three Norteños chased after the truck on foot and reached into their clothing as if they were concealing something. After defendant turned right (apparently in exiting the lot), one of his passengers, "Cornejo," fired at the Norteños from the middle of the front seat. Cornejo fired more than two shots. Defendant grabbed Cornejo's arm, trying to stop the firing and calm Cornejo. When they returned to defendant's house, defendant confronted Cornejo about the shooting.

5

"In his trial testimony, defendant stated that he, Eric Espinoza, and Jose Pineda drove to the grocery store in his mother's 2006 Chevrolet/GMC truck. The altercation outside the store occurred, with the other group as the aggressor, pushing shopping carts and making threats. In response, Espinoza flashed a pocketknife to ward them off. Defendant, Espinoza and Pineda climbed into defendant's truck and drove off; they did notice, however, that Pascual was running after them holding a gun at his waist. Pascual was about 55 to 60 feet away. Defendant did not slow down, he was "panicked"; his friends were screaming to step on the gas because "[Pascual] has a gun," and he ducked down as he drove. Defendant did not hear any gunshots. Defendant, however, did not tell the police in his interview this specific information about Pascual, although he was asked if he had seen anyone with a gun or anyone shooting.

"Based on a variety of factors, two police gang experts opined that defendant was a Sureños gang member on the date of the offense, and they provided a context to this gang confrontation." (*Lisea, supra*, 213 Cal.App.4th at pp. 411-412.)

*2. Kill Zone Instruction and Argument*

Without objection, the trial court instructed the jury with CALCRIM No. 600, attempted murder. As relevant to this case, the jury was instructed as follows:

"To prove that the defendant is guilty of attempted murder, the People must prove that:

"1. The defendant took at least one direct but ineffective steps toward killing another person;

"AND

"2. The defendant intended to kill that person. . . [¶]

"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Christopher Smith, the People must prove that the defendant not only intended to kill Christopher Smith but also either intended to kill

6

Jonathan Pimental, Pascual Pimental, John Vierra, Billy Ray Cook or intended to kill anyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Jonathan Pimental, Pascual Pimental, John Vierra, Billy Ray Cook by harming everyone in the kill zone, you must find the defendant not guilty of the attempted murder of Christopher Smith."

The prosecutor's closing argument addressed the kill zone theory thusly:

"Let's talk about the kill zone.  One of the instructions that you will receive is on the theory of the kill zone and how this applies to this particular case.

"We know that shots were fired towards the Food-4-Less, we know that more than one shot was fired towards the Food-4-Less and we know Christopher was hit because he was in the area which was previously occupied by these particular combatants.

"We know that this particular—these shots were fired from a moving vehicle, we know they were fired towards a different target, and we know based on the nature of the act, the number of shots which were fired, that they were planning on killing the individuals who were in this particular zone.  They weren't just shooting at Jonathan Pimentel or Pascal Pimentel, they were hoping '[w]e're gonna mow down this particular area, hopefully we get some of these individuals.'  And that's what you can legitimately and rationally infer based on the way that they carried out this particular act.  It's a drive-by.

"We all know the dangers of these particular situations.  You are shooting from a motor vehicle, knowing—unless you're a sharpshooter, even if you are a sharpshooter— the dangers which are involved in this particular type of act.  You're firing more than one bullet.  Everybody within that zone does not matter to you.  Their life is meaningless. There's no question you have malice in your heart and if they die as a byproduct of killing your original target that is your intent and that is your purpose and that is what the kill zone theory encapsulates.

7

"When the shots were fired they were fired towards the front of the Food-4-Less where the confrontation between the Nortenos and the Surenos had been. There is no question that this was a full parking lot, that there were individuals who were not only the combatants but were also bystanders in this particular area.

"There was no question Jonathan Pimentel was still in the area when the shots were fired towards the front of that Food-4-Less."

DISCUSSION

I

*Kill Zone and Canizales*

Petitioner contends there was insufficient evidence under *Canizales* to support the kill zone instruction, a prejudicial error.

*A. Legal Background*

The kill zone theory is an attempt to address the problem that the lesser offense, attempted murder, may be more difficult to prove than murder in some circumstances. The mental state for murder differs from attempted murder. While murder does not require an intent to kill, attempted murder requires the specific intent to kill coupled with the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Moreover, under the well accepted doctrine of transferred intent, a shooter who intends to shoot one person and shoots a bystander is subject to the same criminal liability that would have been imposed if the fatal shot struck the intended victim. (*People v. Scott* (1996) 14 Cal.4th 544, 546.) The shooter's culpability is not diminished simply because he or she missed the target. The transferred intent fiction cannot, however, be applied to support attempted murder convictions when the victims were not killed. (*People v. Perez* (2010) 50 Cal.4th 222, 232 (*Perez*).)

The kill zone theory was introduced to California in *People v. Bland* (2002) 28 Cal.4th 313. The defendant in *Bland* shot into a car and, as the driver began to drive

8

away, the defendant and another man continued shooting at the car. (*Id.* at p. 318.) The driver died, and the two passengers in the vehicle were wounded. (*Ibid.*) The defendant was convicted of the murder of the driver and the attempted murder of the two passengers. (*Ibid.*) The Court of Appeal reversed the two attempted murder convictions. (*Ibid.*) Our high court reversed the Court of Appeal, stating: "although the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it [the Maryland court] termed the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. This situation is

9

distinct from the "depraved heart" [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a "depraved heart" [implied malice] scenario.' [Citation.]" (*Bland*, at pp. 329-330.)

Supreme Court cases after *Bland* showed the limits of this theory of liability. In two prominent single shot cases, *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*) and *Perez, supra*, 50 Cal.4th 222, the court reversed the convictions for attempted murder, save one. In *Stone*, the trial court instructed the jury on the kill zone. This was in error. The Supreme Court found the kill zone instruction did not fit the charge or the facts of the case. (*Stone*, at p. 138.) The kill zone, the court explained, "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can also be convicted of attempting to murder other, nontargeted, persons. Here, defendant was charged with but a single count of attempted murder. He was not charged with 10 attempted murders, one for each member of the group at which he shot." (*Ibid.*)

The central issue in *Stone*, however, was not the propriety of the kill zone instruction, but whether there was insufficient evidence to support the attempted murder conviction because the conviction may have been based in part, "on the understanding that attempted murder requires the intent to kill a particular person." (*Stone, supra*, 46 Cal.4th at p. 139.) Attempted murder does not require the intent to kill a particular person. "[W]e conclude that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Id.* at p. 140.) The court's conclusion is consistent with the fundamental principle that attempted murder requires a specific intent to kill a human being, not a specific human being. The case was remanded to the Court of Appeal to "consider any issues regarding the variance between the information—alleging defendant intended to kill Joel F.—and the proof at trial— showing defendant intended to kill someone, although not specifically Joel F." (*Id.* at p. 142.)

In *Perez*, the defendant fired one shot in the direction of seven police officers and one civilian, all of whom were standing close together. (*Perez, supra*, 50 Cal.4th at p. 224.) He was convicted of eight counts of attempted murder. (*Ibid.*) The question presented was not whether the jury was properly instructed, but whether there was sufficient evidence to support all eight counts of attempted murder. (*Id.* at pp. 224-225.) There was not. "In this case there is no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers fired upon. Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control. Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230-231, fns. omitted.)

The prosecution, however, offered the kill zone theory of expanded liability to save the seven attempted murder convictions, citing *Bland.* The Supreme Court rejected the applicability of the kill zone theory to the facts before it. "The facts of this case do not establish that defendant created a 'kill zone' by firing a single shot from a moving car at a distance of 60 feet at the group of eight individuals, notwithstanding that they were all standing in relatively close proximity to one another. *Bland's* kill zone theory of multiple attempted murder is necessarily defined by the nature and scope of the attack. The firing of a single bullet under these circumstances is not the equivalent of using an explosive device with intent to kill everyone in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon. The indiscriminate firing of a single shot at a group of persons, without more, does not amount to an attempted murder of everyone in the group. The holding in *Bland* is not controlling on these facts." (*Perez, supra*, 50 Cal.4th at p. 232.)

11

The case at issue here, *Canizales*, further limited kill zone liability. In *Canizales*, two defendants, fellow gang members, encountered a rival gang member at a neighborhood block party attended by 30 or so people. One of the defendants fired five bullets from either 100 or 160 feet away at the intended victim who was standing next to a gang associate. Neither was hit but a bystander was killed. (*Canizales, supra*, 7 Cal.5th at pp. 599-600.) The two defendants were charged with one count of murder and two counts of attempted murder of the intended victim and his gang associate. (*Id.* at p. 600.) The trial court gave CALCRIM No. 600, a kill zone instruction, addressed to the attempted murder of the gang associate. (*Id.* at p. 601.)

In reviewing the propriety of the kill zone instruction, the Supreme Court held: "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at pp. 596-597.) Conversely, "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.' " (*Id*. at p. 607.) The court stated that, "[i]n determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged

12

victims to the primary target." (*Ibid.*) Our high court further stated: "Past appellate court opinions articulating the kill zone theory are incomplete to the extent that they do not require a jury to consider the circumstances of the offense in determining the application of the kill zone or imply that a jury need not find a defendant intended to kill everyone in the kill zone as a means of killing the primary target, even if their description of the theory is otherwise consistent with our opinion here." (*Id.* at p. 607, fn. 5.)

The *Canizales* court found the kill zone instruction to be prejudicial error. The act of firing five bullets from a nine-millimeter handgun at the group from a distance of 100 to 160 feet away, into an area where there were plentiful means of escape, would not allow a factfinder to reasonably infer that the shooter intended to create a zone of fatal harm around the primary target. (*Canizales, supra*, 7 Cal.5th at pp. 610-611.) As the jury was instructed on "the kill zone theory but no adequate definition to enable the jury to determine whether the theory was properly applicable," this was an error "of federal constitutional magnitude. [Citation.]" (*Id.* at p. 615.) Applying the harmless beyond a reasonable doubt standard,[3] the Supreme Court found the error was prejudicial in light of the evidence of the shooting, the jury's questions, and the prosecutor's argument. (*Canizales* at p. 616.) While there was evidence supporting an intent to kill the victim, there was also evidence supporting a contrary finding. (*Ibid.*) In addition, the prosecutor's argument and the instruction both had the potential to confuse the jurors regarding how to apply the kill zone theory. (*Id*. at pp. 616-617.) Since the jury's

---

[3] *Canizales* left open the possibility that an even more stringent standard, "requiring reversal unless there is a basis in the record to find that the jury actually relied on the valid theory," applied. (*Canizales, supra*, 7 Cal.5th at p. 615.) The Supreme Court subsequently determined the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] applied. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) We apply the *Chapman* standard here.

13

questions and other verdicts did not dispel the risk that the jury relied on an improper theory, reversal was required.  (*Id.* at p. 618.)

*B. Retroactivity and Procedural Bar*

Since *Canizales* was decided after petitioner's conviction was final, we must determine whether the decision applies to his conviction.  The Court of Appeal for the Second District, Division Seven, addressed this issue and found *Canizales* applied retroactively on habeas.  (*In re Rayford* (2020) 50 Cal.App.5th 754, 760.)  Applying state and federal habeas retroactivity cases (see, e.g., *Teague v. Lane* (1989) 489 U.S. 288 [103 L.Ed.2d 334]; *In re Martinez* (2017) 3 Cal.5th 1216), the *In re Rayford* court found "*Canizales* rests on an interpretation of substantive California criminal law," (*In re Rayford*, at p. 776) whose purpose ensuring the reliability of attempted murder convictions strongly favored retroactivity, thereby supporting retroactivity on state and federal analysis (*Id*. at p. 778).

We agree.  By limiting the kill zone theory, *Canizales* prevents defendants who did not intend to kill the victim from being convicted of attempted murder.  Reducing potential liability for a crime is a subject particularly suited to retroactive application on habeas.  *Canizales* applies to defendant's conviction.

Since *Canizales*, a case decided well after the initial petition for writ of habeas corpus was filed, applies here, we reject the Attorney General's contention that the claim is procedurally barred because the initial petition was untimely and because petitioner never objected to the instruction at trial or on appeal.  We shall consider the *Canizales* claim.

*C. Application*

Petitioner asserts the closing arguments show the prosecution made clear that the People sought to prove intent to kill from attempted murder through the kill zone theory. He finds the kill zone was not a proper theory of guilt based on the evidence here. Petitioner argues the shooter here did not create the zone of fatal harm required in

14

*Canizales*, as the shooting, like the one in *Canizales*, was in an open area, a parking lot, the .32-caliber firearm used in the shooting was not consistent with the high-powered weapons typically employed in kill zone cases, only three to six shots were fired, and, while there was no evidence regarding the distance from the shooter to the targets, the gun was fired from a vehicle moving away from the targets, increasing the range as shots were fired. Asserting there was no evidence of an intent to create a kill zone, petitioner concludes the instruction was erroneous, and based on the evidence at trial, the prosecutor's arguments, and the particular inadequacies of the instruction here, prejudicial.

The Attorney General argues that no kill zone instruction was given here because the modified attempted murder instruction required the jury to find the shooter specifically intended to kill the victim, Smith. The People note that the instructions condemned in *Canizales* and in other cases all identified a primary target separate from the actual victim or victims of the attempted murder. (See *Canizales, supra*, 7 Cal.5th at p. 609; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 107, 111; *People v. Mariscal* (2020) 47 Cal.App.5th 129, 133, 135-136, 138.) The juries in those cases were instructed that it had to find an intent to kill the primary victim and an intent to kill the actual victim or an intent to kill everyone in the kill zone. (See *Canizales*, at p. 601, fn. 3; *Cardenas,* at p. 111, fn. 6; *Mariscal*, at p. 138.) The Attorney General points out that under the modified instruction given here, the jury had to find petitioner intended to kill the victim, Smith, before it could render a guilty verdict on the attempted murder count. According to the Attorney General, this renders *Canizales* inapplicable, as this was not a genuine kill zone instruction.

Petitioner replies that the Attorney General errs in focusing solely on the instruction and avoiding any discussion of the prosecutor's argument. Admitting the first part of the instruction here ("Defendant not only intended to kill Christopher Smith") diverged from the standard kill zone instruction, he finds the second part, requiring an

15

intent to kill the Pimentals, Pascual, Vierra, Cook, or anyone within the kill zone, properly states the kill zone theory as it would apply to this case under former CALCRIM No. 600. Although the instruction does not list a primary target, a requirement for the kill zone instruction, petitioner asserts that the prosecutor's closing argument shows the People relied primarily on a kill zone theory to find him guilty of the attempted murder of Smith. Noting that the first part of the instruction regarding intent to kill Smith was redundant since the CALCRIM No. 600 instruction had elsewhere informed the jury it had to find an intent to kill Smith, he concludes it would be no surprise if the jury read the instruction together with the closing argument in a way consistent with the prosecutor's kill zone theory, a theory lacking in the requisite factual support.

We review jury instructions to determine whether there was a reasonable likelihood that the jury applied them in a way that violated the accused's constitutional rights. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237, as modified (Nov. 15, 2007), as modified (Dec. 7, 2007.) We consider the instructions as a whole when making this determination. (*Ibid.*)

While the instruction at issue is not like the kill zone instruction in *Canizales* or other kill zone cases, it still raises a similar risk of confusing the jury. The Attorney General is correct that the kill zone portion of the instruction in this case differs from the other kill zone instructions by not identifying a primary target, and by requiring the jury find defendant intended to kill the victim. However, the Attorney General is wrong that no kill zone instruction was given. The critical last paragraph of the modified CALCRIM No. 600 instruction begins: "A person may intend to kill a specific victim or victims and at the same intend to kill anyone in a particular zone of harm, or 'kill zone.' " As petitioner points out, the instruction also addresses intent to kill other targets in the kill zone, instructing the jury in order to convict petitioner it must also find he intended to kill "Jonathan Pimentel, Pascual Pimentel, John Vierra, Billy Ray Cook, or intended to kill anyone within the kill zone."

16

The most important reason to consider this a kill zone instruction, and a significant source of error, is the paragraph's last sentence: "If you have a reasonable doubt whether the defendant intended to kill Christopher Smith, or intended to kill Jonathan Pimentel, Pascual Pimentel, John Vierra, Billy Ray Cook *by harming everyone in the kill zone*, then you must find defendant not guilty of the attempted murder of Christopher Smith." (Italics added.) This sentence runs the risk of the jury finding defendant guilty of attempted murder not based on an intent to kill Smith, but by finding he intended to harm everyone in the kill zone. Harm to anyone inside the kill zone is not an intent to kill. A jury could read this confusing kill zone instruction to conclude petitioner intended to kill Smith if he intended to harm everyone inside the kill zone.[4] Rather than a mere modification of the CALCRIM No. 600 instruction that the Attorney General purports this to be, it is a kill zone instruction, albeit an erroneously worded one.

This incorrectly worded kill zone instruction did not have the necessary evidentiary support as discussed in *Canizales*. As petitioner correctly points out, only three to six shots were fired from a smaller caliber weapon, from a vehicle moving away from the crowd, into a public area and with no evidence of the shots being fired from close range. In short, there is virtually no evidentiary support for a kill zone instruction, let alone the evidence necessary to support the instruction under *Canizales*.

The risk of improper application of the kill zone instruction by the jury is compounded and the error is rendered prejudicial under *Chapman* by the prosecution's use of the kill zone theory in the closing argument. Although the jury instruction does not identify a primary target separate from the victim, the prosecutor's argument—"They weren't just shooting at Jonathan Pimentel or Pascal Pimentel, they were hoping '[w]e're

---

[4] "Because the intent required for attempted murder is to kill rather than merely harm, it would be better for the instruction to use the word 'kill' consistently rather than the word 'harm.' " (*Stone, supra*, 46 Cal.4th at p. 138, fn. 3.)

17

gonna mow down this particular area, hopefully we get some of these individuals.'  And that's what you can legitimately and rationally infer based on the way that they carried out this particular act.  It's a drive-by"—is the same kill zone theory utilized by the prosecutor in the other kill zone cases.  The required primary target is further identified in the last sentence of the prosecutor's kill zone argument:  " There was no question that Jonathan Pimentel was still in the area when the shots were fired towards the front of that Food-4-Less."  The reliance on the kill zone theory is further supported by the prosecution's arguments that "these shots were fired from a moving vehicle, we know they were fired towards a different target, and we know based on the nature of the act, the number of shots which were fired, that they were planning on killing the individuals who were in this particular zone," and, "[y]ou're firing more than one bullet[,] [e]verybody within that zone does not matter to you.  Their life is meaningless.  There's no question you have malice in your heart and if they die as a byproduct of killing your original target that is your intent and that is your purpose and that is what the kill zone theory encapsulates."

These arguments, when considered in light of the improper kill zone instruction, invite the jury to convict petitioner of attempted murder of Smith based on an intent to kill anyone in the kill zone.  This inference is inconsistent with the intent to kill mental element of attempted murder, and, under *Canizales*, is without sufficient evidentiary support.  Although there is sufficient evidence to support an attempted murder conviction,[5] there is also substantial evidence supporting a finding of no intent to kill Smith.  The victim here was an innocent bystander who was not a member of a rival gang and did not participate in the confrontation that led to the shooting.  Since there is no

---

[5] We address the evidentiary support for attempted murder *post* in section *I.D.* of this opinion.

other evidence[6] that the jury relied on petitioner's intent to kill rather than the kill zone theory, we cannot conclude beyond a reasonable doubt that the error is harmless. We shall therefore reverse the conviction and vacate the sentence.

*D. Retrial*

Retrial on the attempted murder charge is not permitted unless there was sufficient evidence to support the guilty verdict. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].) In his appeal from the conviction, petitioner claimed there was insufficient evidence to support the attempted murder conviction. He asserted there was insufficient evidence that the attempted murder and the assault were the natural and probable consequences of the altercation in front of the grocery store, which we rejected in the unpublished part of our opinion.

We likewise conclude here that there was substantial evidence of an intent to kill which could support a guilty verdict for attempted murder. There was evidence that the shooter intended to kill someone in the crowd. There was testimony that before the shooting started, petitioner either stopped or slowed down the truck, supporting an inference that the shooter could fire more accurately from a "stationary position," thereby showing a "deliberate positioning of the shooter" which is evidence of an intent to kill. (*People v. Cerda* (2020) 45 Cal.App.5th 1, 17, review granted May 13, 2020, S260915 [pulling truck up to house and firing shots from stationary position evidence of intent to kill].) Right before the shooting, a Sureño told the Norteños they had a gun and would shoot them. The number of shots fired, three to six, while not supporting an intent to kill

---

[6] For example, questions from the jury regarding intent to kill or evidence that could support the mental element of attempted murder or other verdicts that would support an inference that the jury made the necessary intent to kill finding. (See *Canizales, supra*, 7 Cal.5th at pp. 617-618.)

19

everyone within a kill zone, can support an intent to kill an individual. Also, Smith was shot when he was behind Pascal and therefore in the line of fire. Evidence that a shooter purposefully fired at the victims, one of whom was positioned one behind the other, "with each directly in his line of fire, can support an inference that he acted with intent to kill both." *People v. Smith* (2005) 37 Cal.4th 733, 743.)

Thus, there is evidence of an intent to kill someone in the group the shooter fired into, and that defendant, a fellow gang member with the shooter, drove the truck in a way to facilitate the attempt to kill. Since, as the Supreme Court held in *Stone*, "a generalized intent to kill someone, but not necessarily a specific target, is sufficient" to support an attempted murder conviction (*Stone, supra*, 46 Cal.4th at p. 136), there is sufficient evidence to support the attempted murder verdict under *Stone*, as there was substantial evidence of an intent to kill someone in the group.[7] The People shall have the option of retrying petitioner on the attempted murder charge.

## II

### *Remaining Contentions*

Petitioner's remaining contentions, that he had inadequate notice he could be principal for the purposes of the section 12022.53 enhancement, that failure to instruct on attempted voluntary manslaughter deprived him of due process, that cumulative error warrants reversal, and that failure to raise any of his habeas contentions at trial or on appeal constituted ineffective assistance, are mooted by our reversal of the attempted

---

[7] In *Stone*, the Court of Appeal found the kill zone instruction was not supported by the evidence, and the error was prejudicial because the prosecutor argued defendant did not intend to kill the victim named in the information but intended to kill someone in the group of 10 people he fired into. (*Stone supra*, 46 Cal.4th at pp. 138-139.) The Supreme Court reversed the Court of Appeal's prejudice finding and remanded for reconsideration in light of the Supreme Court's opinion. (*Id.* at p. 142.) That ruling does not undercut our prejudice analysis, as the prosecutor here argued an incorrect legal theory to the jury which magnified the effect of the improper instruction.

murder conviction. We briefly address the notice contention because it could be relevant if the People retry petitioner for attempted murder.

In his appeal from the conviction, petitioner asserted his "25 years to life sentence for the section 12022.53(e)(1) must be reversed because the jury may have found him only vicariously liable for the qualifying offense of attempted murder under the natural and probable consequences doctrine, and therefore he cannot be deemed a principal in that offense." (*Lisea, supra*, 213 Cal.App.4th at p. 413.) We rejected the contention.

Section 12022.53, subdivision (e)(1) states: "The enhancements provided in this section [including the subdivision (d) enhancement of 25 years to life for personally and intentionally discharging a firearm causing great bodily injury or death] shall apply to any person who is a principal in the commission of an offense [(i.e., the serious felony offenses enumerated in § 12022.53, subd. (a), which include attempted murder)] if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22 [(i.e., committed the § 12022.53-enumerated offense for the benefit of a criminal street gang with the specific intent to further criminal conduct by gang members)]. [¶] (B) Any principal in the [enumerated] offense committed any act specified in subdivision . . . (d)." Petitioner claims our finding that he was a principal was an unforeseen expansion of liability which violates due process.

A claim previously considered and rejected on appeal cannot be relitigated on habeas corpus. (*In re Reno* (2012) 55 Cal.4th 428, 476.) Petitioner therefore cannot assert on habeas that he is not a principal for the purposes of the section 12022.53 enhancement. Assuming the due process argument was not implicitly addressed in our prior decision, we find the claim without merit.

In rejecting petitioner's section 12022.53 claim on appeal, we stated: "And, as explained by our state high court, the natural and probable consequences doctrine constitutes a type of aiding and abetting. '[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is

21

guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117, quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 260 (*Prettyman*).)  This has been the law in California for over a century, since our state high court embraced the natural and probable consequences doctrine of aiding and abetting in *People v. Kauffman* (1907) 152 Cal. 331, 334 (*Kauffman*).  (See *Prettyman, supra*, 14 Cal.4th at pp. 260-261.)" (*Lisea, supra*, 213 Cal.App.4th at p. 414.)

Conceding that a "direct" aider and abettor is a principal under section 12022.53, petitioner claimed on appeal "that this does not describe the aider and abettor under the vicarious liability theory of the natural and probable consequences doctrine." (*Lisea, supra*, 213 Cal.App.4th at p. 415.)  We rejected the argument, finding "aider and abettor under the natural and probable consequences doctrine, though, must know of and intend to assist the perpetrator's target crime (or must commit the target crime himself), and the nontarget crime must be a reasonably foreseeable consequence of that target crime. (*Prettyman, supra*, 14 Cal.4th at p. 261; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1583.)" (*Lisea*, at p. 415.)  We also relied on an earlier court of appeal decision rejecting a similar claim, where a section 186.22 street gang enhancement was also found true. (*Lisea*, at pp. 415-416; see *People v. Gonzales* (2001) 87 Cal.App.4th 1, 13-15.)

Our opinion finding petitioner liable as a principal did not unforeseeably expand liability for the section 12022.53, subdivision (e)(1) enhancment, but instead rejected petitioner's claim that the enhancement did not apply to him based on long-standing principles of California law regarding aider and abettor liability and the natural and probable consequences doctrine.  Applying the enhancement to defendant under the natural and probable consequences doctrine does not violate his due process rights.

22

# DISPOSITION

The petition for writ of habeas corpus is granted.  Petitioner's conviction for attempted murder is reversed, his sentence vacated, and the matter remanded for possible retrial on the attempted murder count and resentencing.  If the People do not elect to retry petitioner, the superior court shall resentence petitioner.


_____\s\_____,
BLEASE, Acting P. J.


We concur:


_____\s\_____,
MAURO, J.


_____\s\_____,
KRAUSE, J.

23